## H. & VAL J. ROTHSCHILD, INC. v. NORTHWESTERN NATIONAL BANK OF SAINT PAUL.

242 N. W. 2d 844.

May 28, 1976—No. 45791.

36

*Vogel, Nemo, Stapleton & Brenner, Louis W. Brenner,* and *E. Martin Stapleton,* for appellant.

*Doherty, Rumble & Butler* and *Bruce E. Hanson,* for respondent.

Heard before Peterson, MacLaughlin, and Scott, JJ., and considered and decided by the court en banc.

SCOTT, JUSTICE.

This is an appeal from a judgment entered by the Ramsey County District Court in favor of respondent, Northwestern National Bank of Saint Paul, and from an order denying a new trial. A declaratory judgment action had been brought to determine the priority of conflicting security interests in the same collateral. The court found that the collateral belonged to respondent, which led to this appeal.

Appellant, H. & Val J. Rothschild, Inc. (hereinafter Rothschild), is a Minnesota corporation engaged in mortgage banking and real estate development. Murray Enterprises (hereinafter Murray) is a Minnesota corporation engaged in construction and a client of Rothschild and Northwestern National Bank of Saint Paul (hereinafter Northwestern).

Rothschild made interim construction loans to Murray, and

Northwestern made working capital loans to Murray. Rothschild's loans were for the construction of five turnkey projects on land within United States Indian reservations.[1] Because of the legal difficulty in foreclosing a mortgage on Indian land, the primary security to Rothschild for its loans was an assignment of Murray's right to receive payment of the proceeds of the construction contracts. The assignment involved herein, executed by Murray to Rothschild on November 15, 1971, stated:

"ASSIGNMENT

"KNOW ALL MEN BY THESE PRESENTS THAT MURRAY ENTERPRISES OF MINNESOTA, INC. * * * does hereby assign to H. & VAL J. ROTHSCHILD, INC. * * * the following rights as security for an interim loan to be handled by Lender in connection with the erection of certain improvements more specifically described in that certain Contract of Sale and agreement to Lease by and between MURRAY ENTERPRISES OF MINNESOTA, INC. and WHITE EARTH HOUSING AUTHORITY * * *.

"(1)    All rights to receive payment from the WHITE EARTH HOUSING AUTHORITY upon delivery of certain improvements to the said party, and all proceeds due Murray Enterprises of Minnesota, Inc. shall be payable directly to Lender at its address.

"(2)    A security interest in that certain lease and possessory interest in property, created by that certain agreement * * *."

Upon discovering that Murray was experiencing financial trouble, on June 6, 1972, Northwestern obtained a security interest which stated:

"§ 2.    SECURITY INTEREST.    As security for the payment of all Liabilities, Borrower hereby grants to Bank a security interest in (i) all Accounts, now existing or hereafter arising, (ii) all interest of Borrower, now existing or hereafter arising, in goods,

---

[1] In these turnkey contracts, the builder-borrower leases the real estate from an Indian housing authority and agrees to reassign the lease and resell the completed housing project and the real estate to the housing authority pursuant to terms of a lease agreement and a contract of sale.

the sale or lease of which gave rise to any Accounts, (iii) all contract rights of Borrower, now existing or hereafter arising, (iv) all chattel paper, documents and instruments relating to Accounts, and (v) the proceeds, products and accessions of and to any and all of the foregoing."

Northwestern obtained another similar security agreement from Murray on July 13, 1972.

On August 3, 1972, and August 16, 1972, Northwestern filed financing statements regarding its Murray security interests in the office of the Minnesota secretary of state. No financing statement was filed by Rothschild.

On April 17, 1974, the White Earth Indian Housing Authority tendered a cashier's check payable jointly to Rothschild and Northwestern as final payment for sale of the White Earth project, the project involved herein. The payees agreed to purchase a certificate of deposit to be held in escrow pending the outcome of this lawsuit.

We are presented with the following issues:

(1)	Whether the security interests of Rothschild and Northwestern in Murray Enterprises' right to receive payment of the proceeds of the White Earth turnkey contract are contract rights within the meaning of Minn. St. 336.9—106.

(2)	Whether the junior, but perfected, security interests of Northwestern have priority over the senior, but unperfected, interest of Rothschild.

■	Murray Enterprises had several interests under the turnkey construction contracts. One interest was a leasehold estate in the land. Another interest was the right to receive payment of the proceeds of the turnkey contracts when construction was completed. Rothschild argues that Murray used the former interest as collateral for its debt and that Minnesota's commercial code does not apply to the financing of real estate transactions.

Minn. St. 336.9—106 defines "contract right" as "any right to payment under a contract not yet earned by performance * * *." The Uniform Commercial Code Comment accompanying

that section in the Uniform Commercial Code indicates that the contract rights to a future income can involve real estate transactions:

"* * * 'Contract right' is a right to be earned by future performance under an existing contract: for example, rights to arise when deliveries are made under an installment contract or as work is completed under a building contract." U. C. C. Comment, 21C M. S. A. p. 269.

Rothschild's argument that its security interest was the assignment of Murray's leasehold estate is untenable in that Murray's leasehold terminated whenever construction was terminated. The assignment from White Earth Housing Authority, which leased the land involved here to Murray Enterprises, states:

"In the event Murray Enterprises of Minnesota, Inc., shall abandon the project * * *, the possessory interest created by this assignment of the lease shall cease * * *."

Northwestern aptly points out that such a leasehold interest was of no value as a security. Rothschild's actual security was intangible collateral in the form of contract rights.

■ Minn. St. 336.9—301(1) provides that an "unperfected security interest" is subordinate to the rights of persons entitled to priority under Minn. St. 336.9—312. A security interest is perfected, according to Minn. St. 336.9—303(1) "when it has attached and when all of the applicable steps required for perfection have been taken." One of those steps is found in Minn. St. 336.9—302, which, with certain exceptions not pertinent here, requires the filing of a financing statement to perfect all security interests. Minn. St. 336.9—302(1)(e) exempts assignments which do not transfer "a significant part" of the contract rights of the assignor. Rothschild is attempting to qualify for this exemption. The test for whether a contract right qualifies for the filing exception is whether the assignment is casual and isolated or whether it is part of the ordinary course of financing. U. C. C. Comment, 21C M. S. A. p. 399.

Rothschild is engaged in the regular business of interim financing and at the time of trial had more than 300 loans amounting to $30 million in process. Rothschild held five assignments in the turnkey projects. While it may be true that these are the only assignments held by Rothschild in its 90-year history, nevertheless Rothschild has extensive experience in commercial finance. The filing requirement for assignments is not obscure and has several parallels in other types of commercial financing such as the recording requirements for a mortgage—requirements with which Rothschild is familiar.

As to the monetary significance of the assignments made to Rothschild, Northwestern points out that Rothschild's contract rights involved 38 percent of the unearned portion of the Murray contracts in April 1971 and 41 percent in January 1972. Rothschild counters that the assignments of contract rights should be compared to the total accounts and contract rights of the assignor. The wording of Minn. St. 336.9—302(1) (e), however, excepts from the filing requirement an assignment which "does not alone or in conjunction with other assignments to the same assignee transfer a significant part of the outstanding accounts *or* contract rights of the assignor." (Italics supplied.) Thus, creditors holding assignments of contract rights are entitled to notice of other assignments of contract rights regardless of total accounts unless the particular contract right involved is insubstantial. Because, when compared to the unearned portion of the contracts involved, Rothschild's assignments involved over one-third of the unearned portion of the Murray contracts, and because Rothschild is engaged in the regular business of interim financing, Rothschild's assignments of contract rights cannot qualify for the filing exemption of § 336.9—302(1) (e).

As for the argument that Northwestern subordinated its claim to that of Rothschild, there is no adequate factual basis for such a claim. Rothschild refers to telephone conversations between representatives of the two parties, but there is no evidence that any subordination agreement was either bargained for or made

in those conversations. Both parties merely assumed at the time that Rothschild's assignment was prior.

Rothschild's argument that the bank's security agreements were limited only to the profits of Murray is unsustainable because Northwestern's security agreements expressly cover all Murray's contract rights, accounts, general intangibles, and chattel paper, documents, and instruments relating to accounts, together with proceeds, products, and accessions thereto.

The trial court stated, in its conclusions of law:

"The Northwestern National Bank of Saint Paul did not waive nor is it estopped from claiming the priority of its security interests in said contract proceeds, nor was the Bank's priority subordinate, nor was the Bank's priority barred by the doctrine of collateral estoppel."

We agree with the trial court. Northwestern did not know until March 1974 that Rothschild's assignment was not filed; therefore, the bank could not have waived its priority. Rothschild knew that its assignment had not been filed; therefore, it could not have reasonably relied on any statement by officers of Northwestern regarding their assumption of Rothschild's priority. The absence of reliance by Rothschild precludes any claim of estoppel against Northwestern. Union Public Service Co. v. Village of Minneota, 212 Minn. 92, 2 N. W. 2d 555 (1942). The fact that in this case there was originally a mistaken belief by Northwestern that Rothschild had a priority does not change the result. James Talcott, Inc. v. Franklin Nat. Bank of Minneapolis, 292 Minn. 277, 194 N. W. 2d 775 (1972).

We said in Borg-Warner Acceptance Corp. v. First Nat. Bank of Pipestone, 307 Minn. 20, 23, 238 N. W. 2d 612, 614 (1976):

"Minnesota has adopted the Uniform Commercial Code. Minn. St. 336.1—102(2)(a) states that one of the purposes of the code is 'to simplify, clarify, and modernize the law governing commercial transactions.' Article 9 establishes a system of notice

filing whereby a creditor by proper filing of a financing statement can rely upon his prior secured position as contained in a written security agreement."

In that case, we went on to say that even though our decision to uphold the priority of filings would work a financial hardship on the bank, to permit evidence of subsequent conduct to restrict the extent of an Article 9 security interest would be improper. We feel that, in the long run, the best interests of all those involved in commercial transactions will best be served by upholding the certainty that Article 9 seeks to achieve through the first-to-file rule.

Affirmed.

MR. JUSTICE OTIS took no part in the consideration or decision of this case.