A-W-D, INC, *v.* CLARK T. SALKELD, d/b/a C.T.S. DISTRIBUTING CO. AND MIDWEST WAREHOUSE CORP.

[No. 3-876A185. Filed February 13, 1978.]

*John H. Heiney, Rothberg, Gallmeyer, Fruechtenicht & Logan*, of Fort Wayne, for appellant.

*Albert Bonner Brown*, of Marion, for appellee Midwest Warehouse.

STATON, P.J.—A-W-D, Inc. (A-W-D) brought an action to recover from Midwest Warehouse Corp. (Midwest) the value of certain property, based upon A-W-D's prior security interest. The trial court found that, although A-W-D did have a prior security interest in the property, its prior security interest had been subordinated to the unperfected security interest of Midwest. The trial court rendered judgment in favor of Midwest. We reverse and remand

the trial court's judgment with instructions to enter judgment in favor of A-W-D.

Clark T. Salkeld (Salkeld), sole proprietor of C.T.S. Distributing Co., purchased merchandise from both A-W-D and Midwest. Midwest retained a security interest in the goods it sold Salkeld through title retention contracts, dated January 31, 1972 and April 4, 1974. Midwest did not file and thereby perfect its security interest. A-W-D sold Salkeld goods on open account. On July 22, 1974, at A-W-D's request, Salkeld executed a security agreement which transferred to A-W-D security interest in Salkeld's inventory and accounts. The financing statement was filed in the office of the Secretary of State on July 24, 1974 and perfected.

A week later, Midwest removed from Salkeld's inventory goods valued at $5,220.59. Later, Salkeld closed his business. A-W-D brought an action to recover the value of the goods removed from Salkeld's inventory by Midwest.[1] The trial court denied A-W-D recovery from Midwest.

As the trial court noted in his memorandum of law, A-W-D would have prevailed under IC 1971, 26-1-9-312, Ind.Ann.Stat. § 19-9-312 (Burns Code Ed.), since its security interest took priority over Midwest's unperfected security interest. See Indiana Comment to IC 26-1-9-312. However, the trial court found that A-W-D, through its agent, had orally subordinated its prior security interest to Midwest's security interest. The court referred to testimony given by Salkeld regarding the circumstances surrounding his execution of the security agreement. During cross-examination, Salkeld stated:

"A.  Mike Brown, District Manager of A-W-D, Fort Wayne — now I don't recall whether he called me on the telephone, or stopped by on a personal visit, one of the two.

"Q.  Can you place the date?

"A.  I would say approximately a week prior to the actual signing of the Security Agreement. He asked me if I would mind signing a Security Agreement. We discussed it, and

---

1.  A-W-D sought to recover the amount Salkeld owed on account, $4,297.45, plus reasonable attorney's fees. Later, Salkeld was adjudged a bankrupt.

I said, 'Well, Mike, what actually is a Security Agreement?' And he said, 'Well, it would put us in a position of being a secured creditor, so in the event that C.T.S. Auto Parts went out of business for any type of reason, they would be a secured creditor, rather than an open account creditor.' I told him at that time that my first obligation was to Midwest Warehouse, and he said, 'Well, this will simply put us in a second place as a creditor.' I says, 'Fine, I don't have any objection to signing it,' and I signed it in good faith. . . ."

Salkeld testified that the above events transpired according to the following sequence:

"He either called or made a personal visit, we talked about the Security Agreement, he came back a few days later with the Security Agreement itself which I signed, and I assume he returned it to Indianapolis. Now, prior to that, he had also read the two Agreements that I had signed with Midwest Warehouse, . . ."

The trial court concluded that A-W-D's representative indicated that Midwest's interests were protected in order to induce Salkeld to sign the security agreement. The court found that these statements operated to subordinate A-W-D's interest to that of Midwest, under Indiana law.

IC 26-1-9-316, Ind. Ann. Stat. § 19-9-316 (Burns Code Ed.), provides that:

"Nothing in this article prevents subordination by agreement by any person entitled to priority."

IC 1971, 26-1-1-201(3), Ind. Ann. Stat. § 19-1-201(3) defines agreement as follows:

"the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this act."

The subordination agreement need not be in writing to be binding. See Indiana Comment to IC 26-1-9-316. In *Hillman's Equipment, Inc. v. Central Realty, Inc.* (1968), 144 Ind. App. 18, 242 N.E.2d 522,

the Court found a subordination agreement to exist:[2]

> "The testimony of Central's agent discloses that immediately preceding the sale he informed appellant not to worry about the equipment and that appellant would get his equipment. This evidence clearly establishes an agreement that appellant was to have the equipment in controversy or the money for it, and in spite of this agreement the equipment was sold to another person. The record also shows a change of position by the appellant in reliance on the agreement with Central, causing appellant to delay the removal of the equipment and thus enabling the sale to proceed."

*Id.* at 526.

Normally, a subordination agreement arises between two creditors of a single debtor. A prior creditor might subordinate his right to receive payments on a debt to the rights of another creditor;[3] or he might subordinate the priority of his secured interest to the interest of another creditor. In either instance, usually the perfected creditor whose interest arises prior in time will waive his priority in favor of a creditor whose interest comes about later in time. In either case, the subordinator will give up a right that belonged to him prior to the subordination agreement.

We hold, as a matter of law, that no subordination agreement existed under the circumstances of this case. The conversations between Salkeld and A-W-D's representative simply do not provide a factual basis for a subordination agreement.

Notably, there was no express agreement to subordinate, either in the security agreement[4] or in the conversation preceding execu-

2. Note, however, that the case was reversed at 253 Ind. 48, 246 N.E.2d 383, when the Supreme Court found that there was a factual controversy concerning the existence of a subordination agreement, which could not be resolved by the appellate court since the trial court had granted summary judgment.

3. In this type of situation, sometimes the agreement will be between a creditor and the debtor to allow the debtor to borrow money from other creditors (to keep a going concern) who will rely on the subordination agreement. The later creditors will be third party beneficiaries to the contract. This is not the situation in this case. A-W-D was a later creditor who purportedly agreed, with the debtor, Salkeld, to subordinate his prior interest to Midwest. Midwest had not relied on the subordination agreement when it had supplied Salkeld goods.

4. The security agreement contends no reference to a subordination of A-W-D's priority to Midwest's interest.

tion of the agreement. The statement made by A-W-D's representative, that A-W-D would occupy second place as a creditor, reflected the true state of priority of interests at that time; since neither party had perfected, Midwest held the prior security interest. A-W-D did not take priority until it perfected its interest two days later. In the interim, Midwest could have prevented A-W-D's priority by perfecting its own interest; this it failed to do.

Other courts have dealt with apparent subordination agreements, which were based upon the mistaken belief of priority. In *Percival Const. Co. v. Miller & Miller Auctioneers*, 532 F.2d 166 (10th Cir. 1976), the court found that an informal subordination agreement was based on the parties' mistaken belief that one of the parties owned the leased equipment. The court held that no subordination resulted, since the parties' agreement recognized what both parties *thought* to be a superior interest. And in *H & Val J. Rothschild, Inc. v. Northwestern National Bank of Saint Paul* (1976), ____ Minn. ____, 242 N.W.2d 844, the court held that certain telephone conversations, during which the parties mistakenly assumed one party's priority, did not constitute an agreement to subordinate:

> "there is no evidence that any subordination agreement was either bargained for or made in those conversations. Both parties merely assumed at the time that Rothschild's assignment was prior."

*Id.* at 848. There is no evidence that A-W-D's representative agreed to subordinate his company's interest to Midwest's. His remarks merely reflected the state of priority at the time, and the presumed priority.

Finally, Midwest in no way relied on the apparent "subordination agreement," or even knew of its existence when it was executed. Midwest did not change its position in reliance on the agreement. See *Hillman's Equipment, Inc. v. Central Realty, Inc., supra,* 242 N.E.2d at 526. See also *H & Val J. Rothschild, Inc. v. Northwestern National Bank of Saint Paul, supra,* 242 N.W.2d at 849, in which the absence of reliance was held to preclude any claim of estoppel.

Midwest failed to follow the provision of the Code, which require

filing to perfect a security interest; A-W-D followed the law (and normal course of trade) and perfected its interest. A-W-D's security interest took priority over Midwest's security interest.[5]

We reverse and remand to the trial court with instructions to enter judgment for A-W-D.

Robertson, C.J., (By designation), concurs in result;

Garrard, J., dissents with opinion.

## DISSENTING OPINION

GARRARD, J. — The majority opinion in this case holds that where a general creditor bargains with its debtor for a security interest and a term of the bargain imposed by the debtor is the protection of another creditor who holds an unperfected security interest, the creditor may accept the benefit of the bargain but reject its burden by recording the security interest thus obtained. I dissent from this view. Our decision is controlled by Article 9 of the Uniform Commercial Code, IC 26-1-9-101 et seq. Further references to the article are limited to the appropriate section number.

For A-W-D to have changed its status from general creditor to secured creditor it was necessary that Salkeld execute a security agreement since Midwest did not have possession of the collateral. § 203(1). That obstacle was met at a meeting between Salkeld and Mike Brown, the District Manager of A-W-D at Ft. Wayne. The evidence, especially when viewed from the perspective favoring the judgment, disclosed that Brown was the authorized agent of A-W-D to procure the agreement or that at least he had apparent authority to act for the corporation. According to the testimony, when Brown explained what he wanted and why, Salkeld "told him at that time that my first obligation was to Midwest Warehouse in Marion, because they had, in fact, put me in business. The merchandise that I stocked was purchased from them. His [Brown's] exact words were that this agreement would place A-W-D in a position second to Midwest Warehouse." In subsequent testimony Salkeld

---

5. This court can not examine the equities of awarding the inventory (goods supplied by Midwest) to A-W-D. *National Bank & Trust Co. of South Bend v. Moody Ford, Inc.* (1971), 149 Ind. App. 479, 273 N.E.2d 757, 760.

stated that Brown was not only aware of the security agreement with Midwest, he had, in fact, read it.

§ 316 provides that nothing in Article 9 prevents subordination by agreement by any person entitled to priority, and as Judge Staton points out the general provisions of the UCC, IC 26-1-1-201(3) define agreement as "the bargain of the parties in fact." Moreover, unlike § 203, § 316 does not express any requirement of a writing. In view of the Indiana Comment to § 316 and *Hillman's Equipment, Inc. v. Central Realty, Inc.* (1968), 144 Ind. App. 18, 242 N.E.2d 522, *rev'd. other grounds* 253 Ind. 48, 246 N.E.2d 383, I believe an oral agreement to subordinate is valid. I do not find the legal effect of the agreement altered by the fact that Midwest did not participate in the discussion and was not even aware it had occurred. Basic contract law recognizes the validity of third party beneficiary agreements, and the right of the beneficiary to enforce the contract. *Voelkel v. Tohulka* (1957), 236 Ind. 588, 141 N.E.2d 344, *cert. den.* 355 U.S. 891, 78 S.Ct. 263, 2 L.Ed.2d 189. Consideration supporting the contract was, of course, the execution of the security agreement by Salkeld. Thus, when the evidence is viewed from the perspective favoring the judgment, as it should be, it clearly supports the court's finding of subordination. This court should not reweigh the evidence and reject reasonable inferences drawn by the trial court.

The judgment should be affirmed.

NOTE—Reported at 372 N.E.2d 486.