JAMES TALCOTT, INC. v. FRANKLIN NATIONAL
BANK OF MINNEAPOLIS.

194 N. W. 2d 775.

February 11, 1972—No. 43164.

278

*Clarence O. Holten* and *James S. Eriksson,* for appellant.

*Paul D. Dove* and *Sax, Dove & Breuning,* for respondent.

*Carl W. Funk,* for Permanent Editorial Board for the Uniform Commercial Code, amicus curiae.

Heard before Knutson, C. J., and Otis, Kelly, and Hachey, JJ.

RONALD E. HACHEY, JUSTICE.*

This is an appeal taken from a summary judgment in favor of defendant, Franklin National Bank of Minneapolis. The action was commenced for the recovery of possession of several motor vehicles, or their value, in which plaintiff, James Talcott, Inc., claimed a superior security interest.

The case was heard on stipulated facts. On February 20, 1968, Noyes Paving Company, hereinafter referred to as "debtor," entered into a conditional sales contract with Northern Contracting Company, as seller, covering the purchase, on an installment basis, of two dump trucks and other construction equipment. On that same day, the seller assigned, without recourse, the conditional sales contract to plaintiff, together with all sums payable thereunder and all right, title, and interest in and to the equipment covered by the contract. On February 21, 1968, a financing statement was filed with the secretary of state naming Noyes Paving Company as debtor, Northern Contracting Company as secured party, and James Talcott, Inc., as assignee of the secured party. The financing statement covered the following items of property: "Construction Equipment, Motor Vehicles."

On May 1, debtor entered into an equipment lease with defendant bank covering one dump truck; and on May 31, a similar lease agreement was entered into between the same parties covering two additional dump trucks and other equipment. Each lease provided that debtor, if not in default, could purchase the leased goods at the end of the lease term for the sum of $1. Defendant did not at that time file a financing statement regarding the equipment described in the two lease agreements.

During the latter part of the year 1968, debtor experienced difficulty in making payments on the conditional sales contract. On January 30, 1969, debtor and plaintiff entered into an agreement extending the time for payment. In consideration of the extension granted, debtor gave plaintiff a security interest "in

*Acting as Justice of the Supreme Court by appointment pursuant to Minn. Const. art. 6, § 2, and Minn. St. 2.724, subd. 2.

all goods (as defined in Article 9 of the Uniform Commercial Code) whether now owned or hereafter acquired." An attached schedule merely repeated in substantially identical form the list of goods attached to the original conditional sales agreement. The new agreement went on to provide that the security interest was granted to secure the payment of all loans, advances, debts, liabilities, obligations, covenants, and duties owing by debtor to plaintiff, including, without limitation, any debt, liability, or obligation owing from debtor to others which plaintiff may have obtained by assignment or otherwise. No additional financing statement was filed in connection with the extension agreement of January 30. At that time, plaintiff did not know of the existence of the motor vehicles and other equipment listed in defendant's two equipment leases and did not rely upon their existence in entering into the extension agreement.

Following the date of the extension agreement, debtor ran into more financial difficulties and defaulted in payments with respect to both the conditional sales contract and the equipment leases. On May 21, 1970, copies of the leases were filed by defendant bank as financing statements with the secretary of state. Sometime during May 1970, defendant repossessed the equipment in question and this action ensued. The precise date on which defendant made the repossession is not clear from the record. The parties agreed that it took place during the month of May 1970. All of the equipment was located with the exception of one item. By agreement between plaintiff and defendant, the equipment was sold, and the proceeds were placed in a special account pending the outcome of this case.

The issues on appeal are: (1) Whether an equipment lease which gives the lessee the right to acquire title to the equipment for $1 upon compliance with the lease terms is a "security agreement" within the meaning of Article 9 of the Uniform Commercial Code (Minn. St. 336.9—101, et seq.); (2) whether debtor had sufficient ownership of the leased equipment so that it became secured property under the extension agreement with

plaintiff; (3) whether the description of the secured property, as it appeared in the extension agreement, was sufficient to meet the requirements of Art. 9 of the Uniform Commercial Code; (4) whether the financing statement filed at the time the first security agreement was assigned to plaintiff was sufficient to perfect a security interest in the property covered by the extension agreement; and (5) which security interest was entitled to priority.

By way of introduction, the Uniform Commercial Code was enacted by the legislature during the 1965 session and became effective on July 1, 1966. The act, Minn. St. c. 336, consists of 10 articles, numbered 1 to 10, and each statutory reference consists of the chapter number, 336, followed by a decimal and numbers corresponding to the article and section.

Minn. St. 336.1—201 contains general definitions. Paragraph (37) of that section defines a security interest as follows: " 'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation." Section 336.9—204 provides how and when a security interest attaches. Section 336.9—107 describes what constitutes a "purchase money security interest," and § 336.9—312(4) prescribes the method by which such a security interest in collateral other than inventory be accorded priority over other security interests.

A proper opinion in this case requires a detailed consideration, step by step, of what transpired and the dates thereof in order properly to resolve the issues before us.

■ *Were the leases security agreements?*

This question is extremely significant because plaintiff's right to recovery is dependent upon a finding that the lease agreements between defendant and debtor were, in effect, security agreements. Plaintiff claims that, because the procedures set out in the code were not followed in a timely manner by defendant, the latter has lost its priority rights to the collateral. It is the clear policy of Art. 9 of the code to look to the substance, rather than to the form, of an agreement to determine whether or not it is

a security agreement. This policy is expressed in the code itself in § 336.9—102(1), which provides in part:

"* * * [T]his article applies so far as concerns any personal property and fixtures within the jurisdiction of this state

"(a) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures."[1]

The language of the code specifically determines whether or not a lease creates a security interest in the collateral. Section 336.1—201(37), defining a security interest, provides in part:

"* * * Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."

The words of that section are unequivocal. An option given to the lessee to purchase the leased property for a nominal consideration does make the lease one intended for security. Hence, the options to buy the equipment in the instant case for the combined sum of $2, nominal in amount when compared to the total rental of $73,303.32, created security interests. The leases in question were precisely the type that Art. 9 was intended to cover, i. e., transactions in goods which were, in substance although not in form, security agreements. See, In re Vaillancourt, 7 U. C. C. Rep. Serv. 748 (D. Maine, 1970); Nickell v. Lambrecht, 29 Mich. App. 191, 185 N. W. 2d 155 (1970) (title to pass at end of term

---

[1] See, also, the comment to this section, which states in part: "Except for sales of accounts, contract rights and chattel paper, the principal test whether a transaction comes under this Article is: is the transaction intended to have effect as security?" U. C. C. Comment 1, 21C M. S. A. 1971 Pocket Part, § 336.9-102.

without further consideration) ; In re Oak Mfg. Inc. 6 U. C. C. Rep. Serv. 1273 (S. D. N.Y. 1969) (a purchase option payment equal to 9 percent of the aggregate monthly payments and 13 percent of the fair market value held nominal) ; and Stanley v. Fabricators, Inc. 459 P. 2d 467 (Alaska 1969) (option to purchase at end of lease for $40 held nominal in relation to $58,000 purchase price). We hold, as did the trial court, that the leases in question were security agreements even though they purported to reserve title in the bank.

Defendant bank did not file a financing statement with the secretary of state at the time of the making of the leases. Accordingly, the security interests of the bank in the equipment which it financed were unperfected at that time. Presumably, defendant was laboring under a misapprehension concerning the nature of the equipment leases. Had it filed a financing statement within 10 days after the leases were signed, under § 336.9—312(4) it would have perfected its security interest in the equipment which it had financed, which, in turn, would have afforded protection against execution creditors, trustees in bankruptcy, and secured parties whose financing statements were filed later. In addition, if the statement had been filed within the prescribed 10-day period, defendant, having a perfected purchase money security interest in the equipment, would have had priority under § 336.9—312(4) over conflicting security interests perfected earlier, including any conflicting security interest plaintiff might have had as a result of its filing the financing statement on February 21, 1968.

■ *Did the debtor "own" the leased property so that it is included as secured property under plaintiff's security agreement?*

This question is a part of the critical issue in the case inasmuch as the second security agreement between plaintiff and debtor (the extension agreement of January 30, 1969) gave plaintiff a security interest in "all goods * * * whether now owned or hereafter acquired" by debtor. The issue turns on whether or not debtor can be deemed to have owned the leased

property at the time it entered into the extension agreement. Minn. St. 336.9—202 provides:

"Each provision of this article with regard to rights, obligations and remedies applies whether title to collateral is in the secured party or in the debtor."

Thus, the draftsmen of the code intended that its provisions should not be circumvented by manipulation of the locus of title. For this reason, consignment sales, conditional sales, and other arrangements or devices whereby title is retained in the seller for a period following possession by the debtor are all treated under Art. 9 as though title had been transferred to the debtor and the creditor-seller had retained only a security interest in the goods. See, Sussen Rubber Co. v. Hertz, 19 Ohio App. 2d 1, 249 N. E. 2d 65 (1969), involving a consignment sale. For the purposes of analyzing rights of ownership under Art. 9, we hold, based upon the stipulated facts of this case, that defendant had only a security interest in the equipment despite a purported reservation of title and that debtor "owned" the equipment at the time that the extension agreement was executed.

■ *Was the description of the secured property, as it appeared in the extension agreement, sufficient to meet the requirements of Art. 9; that is, did the description reasonably identify what was being described?*

Upon examination of the code, it is readily apparent that its provisions give scant guidance in the resolution of this problem.[2] Where this issue has arisen, a number of courts have sustained security agreements containing descriptions almost as general as the one in question in the instant case. See, GAC Credit Corp. v. Small Business Administration, 323 F. Supp. 795, 796 (W. D. Mo. 1971) ("RCA merchandise"); In re JCM Co-op. Inc. 8

---

[2] In contrast to the requirements of a financing statement, for which the code expressly states that the description may be by item or by type, there is no guiding reference relative to the description required in a security agreement.

U. C. C. Rep. Serv. 247, 248 (W. D. Mich. 1970) ("* * * equipment * * * including * * * all tangible personal property"); American Nat. Bank & Trust Co. v. National Cash Register Co. 473 P. 2d 234, 235 (Okla. 1970) ("[a]ll equipment, cash registers, machinery, and tools used in operations service stations at [specified locations]"); Security Tire & Rubber Co. Inc. v. Hlass, 246 Ark. 1113, 1114, 441 S. W. 2d 91, 92 (1969) ("Company owned inventory of Stephens Tire Company, 2517 Alma Highway, Van Buren, Arkansas"); In re Thibodeau, 6 U. C. C. Rep. Serv. 873, 874 (D. Maine, 1969) ("all purchases hereunder"); In re Goodfriend, 2 U. C. C. Rep. Serv. 160 (E. D. Pa. 1964) ("* * * inventory of merchandise to be maintained in an amount not less than $10,000"); National Cash Register Co. v. Firestone & Co. Inc. 346 Mass. 255, 257, 191 N. E. 2d 471, 472 (1963) ("All contents of luncheonette including equipment such as [list of representative items]" held to cover a cash register, although cash registers were not specifically designated).

Minn. St. 336.9—203(1)(b) sets out one of the elements required to make a security agreement enforceable against a debtor. It states that it must contain "a description of the collateral." U. C. C. Comment 1, 21C M. S. A. § 336.9—203, refers to § 336.9 —110, which provides:

"For the purposes of this article any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described."

U. C. C. Comment, 21C M. S. A. § 336.9—110, further delineates the meaning of the statute when it states:

"* * * The test of sufficiency of a description laid down by this Section is that the description do the job assigned to it— that it make possible the identification of the thing described."

The principal function of a description of the collateral in a security agreement is to enable the parties themselves or their successors in interest to identify it, particularly if the secured party has to repossess the collateral or reclaim it in a legal pro-

ceeding. If the debtor himself is willing to give a creditor a security interest in everything he owns, the code does not prevent it, whether his action is prudent or not. Upon default, the creditor takes everything to which the debtor previously agreed; hence, identification is no problem.

The description of the collateral in the extension agreement did what it was meant to do—namely, it included all of the goods then owned, or to be owned in the future, by the debtor. The term "goods" was defined to be those goods as comprehended within the meaning of Art. 9 of the code. The definition selected is embodied in the statute, a definition that is used and applied frequently. The parties sought to create a security interest in substantially all of the debtor's property. That is what was stated and that is what was meant. The parties did not particularize any further, and the statute does not require it.[3]

---

[3] The function of a financing statement is different than that of a security agreement in that the primary purpose of the former is to warn third parties and to place a limit upon what the creditor can take from the debtor, his other creditors, or a referee in bankruptcy. Better practice might dictate that, in framing a description in a financing statement, it be made more restrictive than "all goods" or "all goods except inventory." In the instant case, however, that problem does not arise, and we are not called upon to decide where to draw the line because, although plaintiff's security agreement was very broad and did cover all goods except inventory, its financing statement was much narrower and specifically covered only the debtor's construction equipment and motor vehicles.

In the instant case, the description used by plaintiff in its financing statement was "Construction Equipment, Motor Vehicles." This is a description by type which is expressly permissible under Minn. St. 336.9-402(1). The following cases have upheld general descriptions contained in financing statements: Goodall Rubber Co. v. Mews Ready Mix Corp. 7 U. C. C. Rep. Serv. 1358, 1359 (Cir. Ct. Wis. 1970) ("equipment" held adequate for steel curb and gutter forms); In re Trumble, 5 U. C. C Rep. Serv. 543 (W. D. Mich. 1968) ("Consumer Goods"); In re Bloomingdale Milling Co. Inc. 4 U. C. C. Rep. Serv. 256, 257 (W. D. Mich. 1966) ("all machinery and equipment * * * now owned or hereafter acquired" held to cover after-acquired truck); General Motors Acceptance

It would appear that the policy of Art. 9 is to uphold security agreements according to their terms. Section 336.9—201 states in part:

"Except as otherwise provided by this chapter a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors."

A security agreement should not be held unenforceable unless it is so ambiguous that its meaning cannot reasonably be construed from the language of the agreement itself. Such a test appears to have been intended by the draftsmen of the code and should be applied in this case. We fail to find an impelling reason why we should not approve the description used in this case, and we hold that it suffices within the terms of the statute. We further hold specifically that the description used in the extension agreement between debtor and plaintiff includes the equipment financed by defendant bank.

■ *Was the financing statement, filed at the time the first security agreement was assigned to plaintiff, sufficient to reflect a security interest in the property covered by the extension agreement?*

Defendant argues that plaintiff did not perfect its security interest in the equipment covered by the second security agreement (the extension agreement of January 30, 1969) because of the failure to file an amendment to the financing statement. The

Corp. v Terra Contractors Corp. 6 U. C. C. Rep. Serv. 544, 545 (Civ. Ct. N. Y. 1969) ("motor vehicle" held sufficient for a Cadillac). See, also, Bank of Utica v. Smith Richfield Springs, Inc. 58 Misc. 2d 113, 294 N. Y. S. 797 (1968); In re Kline, 1 U. C. C. Rep. Serv. 628 (E. D. Pa. 1956). The following authorities have held to the contrary: In re Woods, 9 U. C. C. Rep. Serv. 116 (D. Kan. 1971) ("consumer goods"); In re Lehner, 303 F. Supp. 317, 318 (D. Colo. 1969), affirmed, 427 F. 2d 357 (10 Cir. 1970) ("consumer goods"); In re Bell, 6 U. C. C. Rep. Serv. 740, 741 (D. Colo. 1969) ("consumer goods"); Mammoth Cave Production Credit Assn. v. York, 429 S. W. 2d 26 (Ky. 1968) ("All farm equipment * * * including * * * replacements of and additions to equipment").

trial court also followed this line of reasoning in arriving at its decision that plaintiff had not perfected its security interest.

Section 336.9—402(1) provides that "[a] financing statement may be filed before a security agreement is made or a security interest otherwise attaches." This is what happened in the instant case. The financing statement filed February 21, 1968, met all requirements of the code since it described by type ("Construction Equipment, Motor Vehicles") not only the property covered by the original sales agreement which was assigned to plaintiff but also the property, which likewise consisted of motor vehicles and construction equipment, financed by defendant. The code does not require a reference in the financing statement to after-acquired property. Section 336.9—402(4) states:

"The term 'financing statement' as used in this article means the original financing statement and any amendments but if any amendment adds collateral, it is effective as to the added collateral only from the filing date of the amendment."

A careful reading of that section does not compel a finding that the financing statement must be amended when the security agreement is altered.

Section 336.9—204(3) specifically approves the inclusion of after-acquired property in a security agreement. It states:

"* * * [A] security agreement *may* provide that collateral, whenever acquired, shall secure all obligations covered by the security agreement." (Italics supplied.)

That section permits the inclusion of after-acquired property in a security agreement, but it does not require such inclusion in all cases where subsequent collateral is to be added. When §§ 336.9—402(1) and 336.9—204(3) are read together, it is clear they sanction the essential elements of the transaction in the instant case. The financing statement was filed February 21, 1968, and described the type of goods covered as "Construction Equipment, Motor Vehicles." It was sufficient to give notice of the security agreement entered into on February 20, 1968, and

was also sufficient to give notice of the second security agreement of January 30, 1969. As pointed out herein, § 336.9—402(1) specifically permits the filing of a financing statement in advance of the making of the security agreement itself.

The whole purpose of notice filing would be nullified if a financing statement had to be filed whenever a new transaction took place between a secured party and a debtor. Once a financing statement is on file describing property by type, the entire world is warned, not only that the secured party may already have a security interest in the property of that type (as did plaintiff in the property originally financed), but that it may later acquire a perfected security interest in property of the same type acquired by the debtor in the future. When the debtor does acquire more property of the type referred to in the financing statement already on file, and when a security interest attaches to that property, the perfection is instantaneous and automatic. § 336.9—303(1).

Different fact situations may arise resulting in different arrangements between the secured party and the debtor, all within the contemplation of the code. For instance, in their initial dealings they may contemplate either a number of financing transactions, all secured by the property to which the security interest originally attaches, or they may create a single obligation from the debtor to the secured party, to be secured by property the debtor then owns and additional property that he will later acquire. Furthermore, a transaction between the parties may involve a combination of both of these. Even where the parties originally contemplate a single debt, secured by a single item of property or a single group of items, the secured party and the debtor may enter into further transactions whereby the debtor obtains additional credit and the secured party is granted more security.[4] The validity of such arrangements as against credi-

---

[4] The code recognizes the likelihood of the first two of these situations by providing in § 336.9—204(5) that obligations covered by a security agreement may include future advances, and by providing in

tors, trustees in bankruptcy, and other secured parties has been widely recognized by many courts. See, DuBay v. Williams, 417 F. 2d 1277 (9 Cir. 1969); Grain Merchants of Indiana, Inc. v. Union Bank & Sav. Co. 408 F. 2d 209 (7 Cir.), certiorari denied sub nom. France v. Union Bank & Sav. Co. 396 U. S. 827, 90 S. Ct. 75, 24 L. ed. 2d 78 (1969); Rosenberg v. Rudnick, 262 F. Supp. 635 (D. Mass. 1967).

Using future-advance clauses and using after-acquired property clauses in the original security agreement are not the only means by which perfected security interests can be obtained in subsequently contracted obligations or in goods the debtor may later come to own. There is nothing exclusive about § 336.9—204(3, 5). Parties may use future-advance and after-acquired clauses, and they are a great convenience. But, if they are not used, there is nothing in the code which prevents the parties from accomplishing the same result by entering into one or more additional security agreements.

Upon a review of decision law in other jurisdictions it would appear that there is a difference of opinion as to perfection and priority of a later advance where it was not made pursuant to the original security agreement but pursuant to a later agreement which may or may not have satisfied the requirements of the code as to security agreements. The better view holds that, where originally a security agreement is executed, an indebtedness created, and a financing statement describing the collateral filed, followed at a later date by another advance made pursuant to a subsequent security agreement covering the same collateral, the lender has a perfected security interest in the collateral not

§ 336.9—204(3) that (except in certain cases involving crops or consumer goods) a security agreement may provide that collateral, whenever acquired, shall secure all obligations covered by the security agreement. These provisions enable secured parties and debtors who are commencing a series of revolving credit transactions, where the collateral is usually inventory or accounts, to provide in the beginning that all collateral then owned or thereafter acquired by the debtor shall secure all of his liabilities to the secured party.

only for the original debt but also for the later advance. The instant matter involves a parallel situation.[5] See, In re Rivet, 299 F. Supp. 374 (E. D. Mich. 1969).[6]

The error of the trial court in the instant matter was apparently prompted by its reliance on § 336.9—402(4), which provides that any amendment adding collateral to a financing statement is effective as to the added collateral only from the filing date of the amendment. As has been pointed out, however, the financing statement originally filed was broad enough to cover the after-acquired collateral. If, for instance, the equipment leases between debtor and defendant had included items which did not fall within the description "Construction Equipment, Motor Vehicles" (for example, machine tools), then it would have been necessary, in order for plaintiff to perfect its security interest in such different goods, to file either a new financing statement or an amendment to the original one. In either event, the effective date would have been the date of filing.

---

[5] In the case at bar there was an original indebtedness for which a perfected security interest arose by virtue of a security agreement and the filing of a financing statement covering construction equipment and motor vehicles. Thereafter, in consideration of the extension of time for payment the parties agreed that, on the original indebtedness (no other indebtedness was ever created), the collateral for the indebtedness should consist not only of the original construction equipment and motor vehicles but also of all goods owned by the debtor except inventory. Hence, to the extent that the debtor's goods consisted of construction equipment and motor vehicles, the rule applied to future advances should be equally applied to after-acquired property.

[6] In 1966, the Permanent Editorial Board for the Uniform Commercial Code appointed a review committee to make an in-depth study of Art. 9. One of the topics to which consideration was given was the perfection and priority of future advances and whether any change should be made in the code in order to resolve the conflict that had arisen in future-advance cases. The committee concluded that no change was necessary and that the rule of In re Rivet, 299 F. Supp. 374 (E. D. Mich. 1969), was correct. See, Preliminary Report No. 2 of The Review Committee on Article 9 of the Uniform Commercial Code, 25 Bus. Law 1067, 1094 (1970).

■ *Priority.*

As has been pointed out, the record is not clear as to what date defendant repossessed the equipment. The exact date the conflict arose would be helpful in determining which portion of § 336.9—312 should be applied in determining priorities.

From an examination of the record, it is clear that § 336.9—312(4) is inapplicable inasmuch as defendant's security was not perfected within the allotted time thereunder—that is, no financing statement had been filed at the time that the debtor received the equipment or within 10 days thereafter. Had a financing statement covering the equipment leases been filed at the time the transaction between debtor and defendant took place or within 10 days thereafter, defendant would have had priority under this section of the code. Unfortunate as it may be for defendant, this did not take place; hence, § 336.9—312(4) does not govern despite the bank's later filing.

Turning our attention to § 336.9—312(5), we must determine whether paragraph (a) or paragraph (b) governs. Again, the date that the dispute arose is not clear. The parties have agreed that it arose sometime during the month of May 1970. Hence, whether the filing of the financing statement (equipment leases) by defendant was prior to or subsequent to the repossession date is not established. It then follows that § 336.9—312(5)(a) may or may not be applicable. That section provides in part:

"(5)   In all cases not governed by other rules stated in this section * * *, priority between conflicting security interests in the same collateral shall be determined as follows:

"(a)   In the order of filing if both are perfected by filing, regardless of which security interest attached first * * * and whether it attached before or after filing."

With certain exceptions not applicable in the case at bar, a security interest is perfected when a financing statement is filed. Therefore, a reading of paragraph (a) leads us to the conclusion that, if a dispute arises over priority of perfected security inter-

ests (both having been perfected by filing before the dispute arose), then the order of filing of the financing statement governs. We are aware of the date that defendant filed its financing statement (May 21, 1970), but, again, the record is not clear as to the date that the dispute arose (i.e., the date of repossession). Defendant might have filed first and then repossessed, or it might have repossessed first and, upon being confronted with a dispute over priorities, decided to file forthwith. As we have said, if defendant filed first and then repossessed, § 336.9—312(5)(a) governs.

Conversely, if the dispute arose first and thereafter the bank filed, then paragraph (a) of § 336.9—312(5) is inapplicable, and we direct our attention to paragraph (b), which gives the following alternative method of determining priorities under this subsection:

"In the order of perfection unless both are perfected by filing, regardless of which security interest attached first under section 336.9—204(1) and, in the case of a filed security interest, whether it attached before or after filing."

Defendant's security interest did attach first, but (assuming it was filed after repossession) it was not perfected. Plaintiff's security interest attached later—actually after its filing had occurred. But neither of these factors is material in the application of the first-to-perfect rule. Accordingly, when the conflict arose (still assuming it was before defendant had filed) plaintiff was entitled to priority. Once plaintiff's priority had been acquired, no subsequent filing by defendant (more than 10 days after debtor received possession) could alter the situation. Moreover, even if § 336.9—312(5)(a) should apply, plaintiff would still have priority under the first-to-file rule as its filing preceded defendant's by many months.[7]

---

[7] Much of the discussion herein relative to priorities appears somewhat elementary in scope. Inasmuch as this is a matter of first impression concerning that area of the code, we feel that a detailed explanation might be of benefit in future cases.

In passing, it could be said that plaintiff is to receive an unearned windfall, being the beneficiary of a security interest in property of which it wasn't even aware. Unquestionably, defendant bank, through misunderstanding of the applicable provisions of the code, will suffer a substantial loss. By its own failure to conform to and comply with very simple and obvious provisions of the code, it has found itself entangled in other provisions which are admittedly more complex but which are absolutely essential to the whole concept of notice filing. The fundamental purpose of Art. 9 of the code is to make the process of perfecting a security interest easy, simple, and certain. It was intended to be a complete reversal of prior chattel security law and to rid the unaware of the traps of requirement of specific types of acknowledgments, technical affidavits of consideration, selection of specific proper forms, and other pitfalls that were not uncommon. The code very simply and briefly provides for a notice-filing procedure with a minimum of information required to be publicized in a filed financing statement. All that is required is a minimal description, and it may be by type or kind. The statement need not necessarily contain detail as to collateral, nor any statement of quantity, size, description or specifications, or serial numbers. No preciseness is required with respect to whether the collateral exists at the time of filing or is to be acquired thereafter, and no statement of charges, payment schedule, or maturity date need be included in the statement. The first to file shall prevail. Although there are a few exceptions, they are very clearly and definitely stated. To affirm here would amount to a limitation upon the efficacy of the first-to-file rule, which is basic and essential to the certainty that Art. 9 seeks to achieve. Moreover, to hold that plaintiff was required to file an additional financing statement to cover the extension agreement of January 30, 1969, would have a distastrous effect upon financing transactions.

The summary judgment for defendant is reversed, and the matter is remanded with directions to enter judgment for plain-

tiff. Since several collateral issues not involved in this appeal remain unresolved, we remand this case to the lower court for further proceedings to make proper disposition of those issues in accordance with the rulings here.

Reversed and remanded for further proceedings.

NOTE: Upon request by an appellate court, the Permanent Editorial Board for the Uniform Commercial Code will submit a brief amicus curiae when appeals are filed involving issues arising under the code. Such a brief was submitted in the instant matter upon request of this court. Several questions raised in the instant appeal have not yet been squarely ruled upon by any reported decision of a higher court (to the best of the board's knowledge), and other issues raised have been dealt with in several states, although sometimes not in harmony. The board's participation is not that of an advocate but is made solely in the interest of effecting uniformity of decisions in all jurisdictions to the extent possible.

MR. JUSTICE TODD, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

