**STATE BANK OF YOUNG AMERICA, Appellant,**

v.

**VIDMAR IRON WORKS, INC., Respondent.**

No. 49229.

Supreme Court of Minnesota.

March 28, 1980.

Rehearing Denied May 5, 1980.

McVay & O'Connor, Robert A. Nicklaus and Thomas J. O'Connor, Bloomington, for appellant.

Trenti, Saxhaug, Berger, Carey, Roche, Stephenson & Richards, Robert F. Berger and Sam A. Aluni, Virginia, for respondent.

Heard before ROGOSHESKE, KELLY and YETKA, JJ., and considered and decided by the court en banc.

YETKA, Justice.

The appellant State Bank of Young America brought this action against Vidmar Iron Works, Inc., to recover under security interests it held securing the unpaid debts of Adaptable Industries, Inc. Trial was held before the Carver County District Court, and the court entered findings and conclusions against the appellant. The appellant then moved for a new trial or, in the alternative, for amended findings and conclusions. The court denied that motion, and the appellant has appealed the order denying the motion. We reverse and remand.

This case presents the following issues for decision:

I. Did the State Bank of Young America have a valid security interest which would entitle it to collect the debts owed by Vidmar Iron Works, Inc., to Adaptable Industries, Inc.?

A. Was the bank's security interest in the accounts receivable of Adaptable Industries covering all present and future loans automatically extinguished when the only outstanding loan was renewed or did the security agreement cover the renewal loan and subsequent loans?

B. Did the bank's security interest in the inventory of Adaptable Industries cover raw materials owned by Vidmar Iron Works which Adaptable was converting into finished products to the extent of the value added by Adaptable?

C. If either security interest applied, was it defeated by the change of corporate name or form by Adaptable?

II. Did Vidmar Iron Works receive sufficient notice of the security interest of the bank in the accounts receivable or inventory of Adaptable Industries or the subsequent corporate forms?

There is no dispute as to the material facts. Adaptable Industries, Inc., ("Adaptable") is a metal goods fabricating shop of which Norman and Diane Briggs are the sole shareholders, directors and officers. On December 10, 1973, the appellant, State Bank of Young America ("the bank"), loaned Adaptable $1,000. The loan was secured by a security agreement covering all accounts receivable of Adaptable. The agreement secured all present and future debts of Adaptable to the bank.

On January 11, 1974, the bank loaned Adaptable an additional $500. On January 30, the original $1,000 loan was paid off and the $500 note was renewed. Subsequently, the bank continued to make additional loans to Adaptable. One note executed on June 30, 1975, indicates on its face that it is secured by an existing security agreement covering "receivables."

On March 4, 1975, in conjunction with another loan, Adaptable gave the bank a security interest in both its inventory and its machinery, tools and equipment. The security agreement included the proceeds of such items and secured all present and fu-

ture debts. A second security interest in both inventory and equipment securing present and future debts was executed on September 2, 1975. All three security agreements referred to were duly filed in the appropriate offices.

The bank ultimately loaned Adaptable approximately $165,000 from time to time, the bulk of which was paid in due course. The outstanding balance on the debts at any one time ranged from $500 to $30,000.

Adaptable had apparently made a number of purchases from a steel supply company, Paper Calmenson & Company ("PACAL"), and was in debt to PACAL. In the hope that Adaptable would be able to pay its debt, a representative of PACAL introduced Norman Briggs of Adaptable to the respondent, Vidmar Iron Works, Inc. ("Vidmar"). Vidmar is a larger metal shop which was looking for help with some of its overflow work. The record clearly shows that an agreement was entered into between PACAL and Vidmar that payments made to Adaptable by Vidmar would include PACAL's name on the checks in order to repay the debt Adaptable owed PACAL.

On August 7, 1975, Vidmar placed its first order with Adaptable at a price of $15,250. It later placed two smaller orders with Adaptable. The contracts involved paying Adaptable to do fabricating work on raw materials supplied by Vidmar. In early September 1975, the bank telephoned Mr. Vidmar, president of Vidmar Iron Works, and notified him of its security interest in Adaptable's accounts receivable. There was some question as to whether the call was received before or after Vidmar's first payment to Adaptable on September 11. However, Mr. Vidmar's testimony that they had intended to put the bank's name on the first check shows that the call came first. At that time, Mr. Vidmar said he would consult the company's attorney.

At some point thereafter, Norman and Diane Briggs began operating their business under the name of Norman Briggs Company. Vidmar then canceled its largest order with Adaptable and reordered it under the new company name. The company operated out of the same building and with the same employees and equipment as Adaptable. An attorney for Briggs notified the bank by letter of the change to the new business name. Subsequently, Briggs formed a new corporation and operated under the name of Norm Industries, Inc. The assets, if any, of Norman Briggs Co. were sold to Norm Industries, Inc., for $1. Vidmar was aware that the reason for Briggs' action was Briggs' financial problems with the bank.

The bank called Mr. Vidmar again in late September and again asked to be included on any checks. Mr. Vidmar responded that he had checked with his attorney and would not pay the bank. On October 22, 1975, the bank sent Vidmar a certified letter notifying him of the bank's inventory security interest. At that time, Vidmar was making checks payable to the new company names. However, the letter stated that the bank's interest applied even if the debtor changed names. Mr. Vidmar admitted receiving both calls and the letter. While he declined to put the bank's name on the checks, Mr. Vidmar continued to place PACAL's name on several of the checks pursuant to the agreement referred to previously.

In November 1975, a meeting was held between the bank and Briggs and their respective attorneys to discuss the situation. After the meeting, Briggs' attorney wrote the bank:

> The new company, Norm Industries, Inc. can handle the payment of the approximate sum of $56,000 owed to the bank [by Adaptable] if amortized over 48 months with a payment of approximately $1,300 per month. I have set this thing up so that the first payment would be made in cash on December 15, 1975 and monthly thereafter. I appreciate Mr. Nicklaus' comments about the existing notes and security agreements in that they should stay as they are. By doing so, the bank would not be waiving or giving up any claims or legal positions that it now has. I would have Norm Industries, Inc. adopt a resolution and furnish the bank with a copy in which, in

exchange or consideration for receiving any equities that Adaptable Industries, Inc. and Norman Briggs individually may have or will have in the equipment, tools, inventory and accounts receivable, the new corporation will make the $1,300 monthly payments to the bank.

The corporation never adopted such a resolution, but it did commence the $1,300 payments and made at least the first such payment on December 15.[1]

Ultimately, however, the bank called in all of its notes and liquidated the assets of Adaptable. After deducting the proceeds of the liquidation sale, the bank claims a deficiency of principal and accrued interest of approximately $23,000. The bank further claims that payments made by Vidmar to Adaptable total approximately $31,000, all of which were made after the bank's first phone call to Mr. Vidmar.

The basis of the bank's right of action against Vidmar rather than Adaptable is found in the security agreements. The agreements provide that the bank may, at any time, make direct collection of the accounts or proceeds of goods secured. *Cf.* Minn.Stat. §§ 336.9–318(3), –502(1) (1978). The agreements also authorize the bank to consider the debtor in default if it deems its security impaired or its risk materially increased. *Cf.* Minn.Stat. § 336.1–208 (1978). Vidmar does not deny that it is liable to the bank if the issues discussed below are resolved against it.

■ I.A. The security agreement covering accounts receivable executed in connection with the December 10, 1973, loan secured that loan and "all other liabilities or indebtedness of borrower to the bank * * now existing or hereafter at any time created, arising or incurred * * *." On January 30, 1974, the initial loan was paid in full and the second loan was renewed. Vidmar claims that the security agreement was automatically extinguished when both exist-

ing loans were discharged. This argument is without merit.

Initially, it should be noted that the bank and Adaptable both considered the security agreement to have continued to be in force. This is shown by the fact that on June 30, 1975, an additional note was executed which indicated on its face that it was secured by an existing security agreement covering "receivables." Although the date of the prior security agreement was not filled in, there was only one such agreement in existence.

The question of whether a renewal note is secured under the original security agreement requires an interpretation of Article 9 of the Uniform Commercial Code (U.C.C.) and non-code law governing the effect of renewal notes. With regard to the latter, this court has stated:

> It is generally held that the mere execution of a renewal note evidences the same debt by a new promise and does not constitute a payment or discharge of the original note but operates only as an extension of time for payment.

*Farmers Union Oil Co. v. Fladeland,* 287 Minn. 315, 319, 178 N.W.2d 254, 257 (1970).

*Christofferson v. Howe,* 57 Minn. 67, 58 N.W. 830 (1894), cited by the respondent, is distinguishable from the present case. In that case, the parties had settled a series of prior debts by the issuance of a new note for the net balance due. The court held that a note settling a running account constitutes a fresh promise which discharges the prior debts. The present case involves the renewal of a single debt, not the settlement of a running account.

Courts in other jurisdictions interpreting the U.C.C. in situations identical to that presented in this case, involving the renewal of the only outstanding debt, have held the renewal debt to be covered under the

---

1. The failure of the corporation to adopt such a resolution is not surprising. The two certificates of stock issued to Norman and Diane Briggs and the minutes of the first meeting of

shareholders and directors were never signed. So far as the corporate minute book shows, no corporate meetings were held or actions taken after the first meeting of November 5, 1975.

existing security agreement.[2] *Citibank, N.A. v. Halpert* (*In re Lawrence Peska Associates, Inc.*), 27 U.C.C.Rep.Serv. 272 (S.D. N.Y.1979); *Hackworth v. First National Bank of Crossett*, 265 Ark. 668, 580 S.W.2d 465 (1979).

■ While the U.C.C. specifically provides that a security agreement may secure future advances as well as the original loan, Minn.Stat. § 336.9–204(3) (1978), renewal notes are secured under the original agreement even in the absence of a "future advances" clause since the renewal continues the same debt and is not a new "advance." *Mid-Eastern Electronics, Inc. v. First National Bank of Southern Maryland*, 455 F.2d 141 (4th Cir. 1970); *Commercial Bank of Middlesboro, Ky. v. Carter* (*In re Cantrill Construction Co.*), 418 F.2d 705 (6th Cir. 1969), *cert. denied*, 397 U.S. 990, 90 S.Ct. 1124, 23 L.Ed.2d 398 (1970). Thus, the renewal of the note in this case did not discharge either the debt or the security agreement.

■ The respondent also argues that if all debts were paid, the security interest somehow expires. The U.C.C. provides:

[W]henever there is no outstanding secured obligation and no commitment to make advances, incur obligations, or otherwise give value, the secured party must on written demand by the debtor send the debtor, for each filing officer with whom the financing statement was filed, a termination statement to the effect that he no longer claims a security interest under the financing statement * *.

Minn.Stat. § 336.9–404(1) (1978). However, this provision does not mean that the security interest is automatically terminated. It merely creates a right in the debtor to demand such a statement and does not create a duty in the creditor to issue such a release if not requested. *In re Glawe*, 6 U.C.C.Rep.Serv. 876 (E.D.Wis.1969); *Texas Kenworth Co. v. First National Bank of Bethany*, 564 P.2d 222 (Okl.1977).

■ In this case, the debtor, Adaptable, never requested such a release but rather

continued to incur additional debts. Therefore, the December 10, 1973, security interest in accounts receivable remained valid after January 30, 1974, and covered the renewal note and the additional loans made by the bank.

I.B. Vidmar next argues that since it owned the steel which was processed by Adaptable, the bank's inventory security interest could not attach to it. The U.C.C. states that goods taken as collateral are classified as "inventory:"

if they are held by a person who holds them for sale or lease or to be furnished under contracts of service or if he has so furnished them, or if they are raw materials, work in process or materials used or consumed in a business.

Minn.Stat. § 336.9–109(4) (1978).

■ The U.C.C. does not require that collateral be owned by the debtor. In at least two instances, the U.C.C. specifically refers to situations in which the debtor is not the owner of the collateral. In defining the term "debtor," section 336.9–105(1)(d) states "[w]here the debtor and the owner of the collateral are not the same person, the term 'debtor' means the owner of the collateral * * *." Section 336.9–112 is entitled "Where Collateral is Not Owned by Debtor" and specifies certain rights of the owner which are not relevant here. The lack of a requirement of ownership of the collateral is consistent with the U.C.C.'s general non-reliance on the use of "title" to determine rights. *See* sections 336.2–401, 336.9–202.

Rather than requiring title, the U.C.C. only requires that the debtor have "rights in the collateral." Section 336.9–203(1). Professor Gilmore has written:

The Article [Article 9] does not specify the quantum of "rights" which a debtor must have in collateral to support a security interest: evidently less than full "legal title" will do and the secured party will get whatever rights the debtor had * * *.

1 G. Gilmore, *Security Interests in Personal Property* § 11.5 at 353 (1965).

---

2. The legislature has directed that the U.C.C. be interpreted uniformly with other states in order to effectuate its purpose to make the

laws of the several states uniform. Minn.Stat. §§ 336.1–102(2)(c), 645.22 (1978).

Vidmar's argument that Adaptable had no rights in the steel is erroneous. Adaptable had contract rights in the goods to the extent of the amount due for its work and had a statutory lien in the goods to secure it. The lien would have been one granted for "personalty in possession" under Minn.Stat. §§ 514.18–.22 (1978). Section 514.19(4) allows such a lien for anyone "[m]aking, altering or repairing any article, or expending any labor, skill or material thereon." Such a lien would even have had a priority over any perfected security interest in the steel held by Vidmar or its creditors. Section 336.9–310 (1978) states:

> When a person in the ordinary course of his business furnishes services or materials with respect to goods subject to a security interest, a lien upon goods in the possession of such person given by statute or rule of law for such materials or services takes priority over a perfected security interest unless the lien is statutory and the statute expressly provides otherwise.

This court has never considered whether the rights of one in Adaptable's position are sufficient to allow a security interest to attach. However, in *James Talcott, Inc. v. Franklin National Bank*, 292 Minn. 277, 194 N.W.2d 775 (1972), this court held that a security interest could attach to property purportedly leased by the debtor. Looking to the substance of the transaction, the court held that ownership for Article 9 purposes was not dependent upon formal title. The court stated:

> [T]he draftsmen of the code intended that its provisions should not be circumvented by manipulation of the locus of title. For this reason, consignment sales, conditional sales, and other arrangements or devices whereby title is retained in the seller for a period following possession by the debtor are all treated under Art. 9 as though title had been transferred to the debtor and the creditor-seller had retained only a security interest in the goods.

292 Minn. at 285, 194 N.W.2d at 781.

In a case dealing with facts identical to those of this case, the Oklahoma Supreme Court held that a security interest could attach. *Morton Booth Co. v. Tiara Furniture, Inc.*, 564 P.2d 210 (Okl.1977). The facts of that case were stated as follows:

> The mainstay of Tiara's business prior to its failure was a contract with Booth for the manufacture and sale of gun cabinets. Under the terms of the contract Booth supplied most of the basic materials, i.e. glass, plywood, locks, hinges, pulls, felt, other hardware and packing cartons. Tiara was to supply the structural lumber and construct the cabinets to Booth's specifications. Upon completion of the cabinets, Tiara packed the cabinets in cartons fabricated from materials supplied by Booth and shipped them to Booth which would pay a reduced price for the finished product.

564 P.2d at 211. Relying in part on the quoted passage from our decision in *James Talcott, Inc.*, the court held that the debtor had sufficient "rights" in the material to allow the bank's inventory security interest to attach.

We hold that Adaptable had sufficient "rights in the collateral" under section 336.-9–203(1) to allow the bank's inventory security interest to attach. However, as Professor Gilmore stated, *supra*, the secured party only gets rights in the goods to the extent of the debtor's rights in them. Adaptable's rights in the goods were based on the payments due under the contracts from Vidmar. In this case, the bank properly seeks only to recoup those payments and is not claiming the value of the raw materials as supplied by Vidmar. The payments made are more than sufficient to cover the remaining unpaid debt of Adaptable.

■ I.C. Vidmar also argues that the bank's security interest was defeated by the change in name and corporate form from Adaptable Industries, Inc., to Norman Briggs Co. and Norm Industries, Inc. The U.C.C. was amended in 1972 to provide as follows:

Where the debtor so changes his name or in the case of an organization its name, identity or corporate structure that a filed financing statement becomes seriously misleading, the filing is not effective to perfect a security interest in collateral acquired by the debtor more than four months after the change, unless a new appropriate financing statement is filed before the expiration of that time. A filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of or consents to the transfer.

Minn.Stat. § 336.9–402(7) (1978). The requirement of a new filing after 4 months does not affect this case because all of the relevant transactions occurred within 4 months of the change in corporate name. In addition, the change could not have made the financing statement misleading as to any of the parties involved here, as they were all well aware of the events transpiring.

The Official Comment to the 1972 amendment states that "[t]he old financing statement * * * would continue to protect collateral acquired before the change and * * * would also protect collateral acquired within the four months." We hold that the comment correctly interprets the law and that the security interest remained valid during the 4-month period despite the change in name and corporate form. *Fliegel v. Associates Capital Co. of Delaware, Inc.,* 272 Or. 434, 443, 537 P.2d 1144, 1149 (1975).

It has also been held that:

A debtor cannot destroy the perfected security interest of a secured party by merely changing its name or corporate structure, particularly when there is no evidence to indicate that the secured party had any knowledge thereof.

*Inter Mountain Association of Credit Men v. Villager, Inc.,* 527 P.2d 664, 671 (Utah 1974). In this case, the bank did have notice of the name change through the letter to the bank from the attorney for Briggs. However, that does not change the result, especially in light of the second letter from Briggs' attorney which led the bank to believe that the debts of Adaptable would continue to be paid despite the change in corporate name and form.

This court has held that an express or implied assumption of debts forms an exception to the general rule that a receiving corporation is not responsible for the debts of a transferring corporation. The court has stated:

We hold that where one corporation transfers its assets to another corporation, absent consolidation, merger, or a mere continuation of the selling corporation such as a reorganization, the receiving corporation is not responsible for the debts of the transferring corporation except (a) where the purchaser agrees, expressly or impliedly, to assume such debts, or (b) the transfer of assets is entered into for inadequate consideration, or otherwise fraudulently, in order to escape liability for such debts.

*J. F. Anderson Lumber Co. v. Myers,* 296 Minn. 33, 206 N.W.2d 365, 370 (1973).

The second letter from Briggs' attorney stated that the new corporation "can handle the payment of the approximate sum of $56,000 owed to the bank if amortized over 48 months with a payment of approximately $1,300 per month" and stated that Norm Industries, Inc., would adopt a resolution to assume the debt of Adaptable on those terms. Although the new corporation never adopted any resolution on this proposal, the statement by its attorney might constitute an express assumption of the debts of Adaptable. At any rate, the statements made in the letter plus the payment of $1,300 by Norm Industries, Inc., on December 15, 1975, at least establish an implied assumption of Adaptable's debts.

In addition to the implied assumption, the transfer of assets in this case was for inadequate consideration. There was no consideration given for the transfer of the assets of Adaptable Industries, Inc., to the Norman Briggs Co. The stated consideration for the sale of the assets of the Norman Briggs Co. to Norm Industries, Inc., was $1.

Thus, under the U.C.C. itself and under the common law rule governing the assumption of debts, we hold that the change from Adaptable Industries, Inc., to the other names and corporate forms did not defeat the bank's perfected security interest.

■ II. Finally, Vidmar argues that the bank did not take sufficient steps to notify Vidmar of the bank's security interests in Adaptable. Obviously, the certified letter was sufficient notice and was received prior to most of the payments made. Vidmar's claim is that the telephone calls were insufficient notice as to the initial payments, including all checks made payable to Adaptable Industries, Inc.

The U.C.C. requires the giving of notice in many different situations. The code's overall provision on the requirement states:

A person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it. A person "receives" a notice or notification when

(a) it comes to his attention; or

(b) it is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications.

Minn.Stat. § 336.1–201(26) (1978). The code thus does not require any particular form of notice but only that the steps taken be reasonable. Where the code requires "written notice," it states as much in those terms or says that notice must be "sent." *See, e.g.*, Minn.Stat. § 336.9–504(3) (1978).

Drawing primarily on this intentional difference in requirements, many courts have held that oral notice, such as the phone call in this case, is sufficient to give notice or notify another under section 1–201(26). *GAC Credit Corp. v. Small Business Administration*, 323 F.Supp. 795 (W.D.Mo.1971); *Page v. Camper City & Mobile Home Sales*, 292 Ala. 562, 297 So.2d 810 (1974); *Umbaugh Pole Building Co., Inc. v. Scott*, 58 Ohio St.2d 282, 390 N.E.2d 320 (1979); *accord*, J. White and R. Summers, *Handbook of the Law Under the Uniform Commercial Code* 348, 918 (1972). The fact that notice was given orally does not invalidate the notice, but is only one factor to be considered in determining the reasonableness of the notice given. *Hall v. Owen County State Bank*, Ind.App., 370 N.E.2d 918 (1977).

Under the facts of this case, the oral notice given was sufficient. While more formalities might be required under different circumstances, a call to the president of a small business in Mountain Iron is clearly sufficient. In addition, Vidmar admitted receiving the calls so there is no question of reliability of proof involved. Oral, rather than written, notice did not prejudice Vidmar in any way. Even after receipt of the certified letter, Vidmar still chose not to pay the bank.

■ The facts show that Vidmar was well aware of the bank's interest and took a calculated risk in deciding not to pay the bank. It elected instead to make checks payable jointly to Adaptable and PACAL, with whom it dealt regularly. It must be emphasized that the U.C.C. imposes on all parties to commercial transactions the obligation of good faith. Minn.Stat. § 336.1–203 (1978). The decision by Vidmar to prefer an unsecured creditor of Adaptable to a secured creditor, even after receiving notice of the security interest, does not comport with good faith as required by the code. Vidmar could easily have avoided the problem by notifying PACAL of the superior claim of the bank, by making payments jointly to Adaptable, PACAL and the bank and allowing them to allocate the proceeds, or possibly by bringing an interpleader action under Minn.R.Civ.P. 22.

In light of the foregoing, we must reverse the decision of the trial court and remand the case to allow the bank to enter judgment against Vidmar. Since the trial court held against the bank, it did not have reason to make findings and conclusions regarding the amount of the unsatisfied debt due the bank or the amount of the payments made by Vidmar. We would

hope that on remand the parties could stipulate the amount of judgment; if not, the district court should make the necessary findings and enter judgment accordingly.

Reversed and remanded.