# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

---

No. 99-6023 MN

---

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| Jesus E. Cantu, | * | |
| | * | |
| Debtor. | * | |
| | * | |
| Michael S. Dietz, Trustee, | * | Appeal from the United States |
| | * | Bankruptcy Court for the |
| Appellant, | * | District of Minnesota |
| | * | |
| v. | * | |
| | * | |
| Hormel Employees Credit Union, | * | |
| | * | |
| Appellee. | * | |

---

Submitted: July 20, 1999
Filed: September 16, 1999

---

Before KOGER, Chief Judge, SCHERMER and SCOTT, Bankruptcy Judges

SCHERMER, Bankruptcy Judge

The Chapter 7 Trustee, Michael Dietz, (the "Trustee"), appeals from a bankruptcy court[1] order declaring that the Hormel Employees Credit Union ("Credit Union") holds a

---

[1]    The Honorable Dennis O'Brien, Chief Judge, United States Bankruptcy Court for the District of Minnesota.

valid and enforceable, properly perfected security interest in the Debtor's vehicle. Because we find that the Credit Union's security agreement meets the requirements of Minn. Stat. § 336.9-203(1)(a) (Supp. 1999), we conclude that the security interest attached to the vehicle, and accordingly, affirm.

## Background

Prior to filing his Chapter 7 bankruptcy petition, the Debtor purchased a truck with financing provided through the Credit Union's open-end loan program. Under that loan program, employees complete one general loan agreement and thereafter are eligible to draw funds on either an unsecured or secured basis. Any advances taken from the Credit Union under this general program are called "Sub-accounts." With respect to secured Sub-accounts, the loan agreement grants a security interest to the Credit Union in personal property but does not describe the property that is to serve as collateral. Instead, the loan agreement refers to a second document, called a funds advance voucher, and states that the collateral will be described on that document. When issued, the funds advance voucher lists the amount of the loan, the amount of monthly payments, the applicable interest rate, and a detailed description of the property that serves as collateral for the specific Sub-account loan. The borrower/debtor signs the loan agreement but is not required to sign the funds advance voucher.

In the instant case, the Debtor signed the loan agreement on July 7, 1997, and on the same date, the Credit Union issued the funds advance voucher, fully describing the collateral by make, model, year, and vehicle identification number. The loan agreement specifically referred to the funds advance voucher stating: "*with respect to my secured Sub-accounts, . . . I am giving you a security interest in certain other personal property . . . which property will be individually identified in separate funds advance vouchers which I will receive at the time of each advance made under any Sub-account.*" (Italics added). On July 7, 1997, the Credit Union also issued a check for the loan proceeds payable to the Debtor and to the automobile dealer from whom Debtor intended to purchase the described vehicle. The funds advance voucher contained the following recitation on behalf of the Debtor concerning that loan proceeds check:

2

*by endorsing my loan check . . . . I give you a security interest in the property identified above to secure my obligations with regard to Sub-account noted above in accordance with the minimum payment and security agreement provision of the [loan agreement]. Your rights to the security are governed by that Agreement.* (Italics added).

The funds advance voucher also contains a critical statement providing that all terms of the funds advance voucher are incorporated into the loan agreement and are binding upon the Debtor with the same effect as if the terms were set forth in the loan agreement. As stated, however, the Debtor was not required to sign the funds advance voucher.

Because no single document contained the Debtor's signature, language granting a security interest, and a description of the collateral, the Trustee asserted that the Credit Union's security interest did not attach and sought to recover the vehicle for the benefit of the estate under 11 U.S.C. § 544. The bankruptcy court heard cross-motions for summary judgment and found that the Credit Union's loan documents had to be read together. When so read, the court found that the documents created a valid lien.

## Standard of Review

The facts are not in dispute. Whether the Credit Union's loan documents created an enforceable security interest is a question of law which we review de novo. Litton Indus. Automation Sys., Inc. v. Nationwide Power Corp., 106 F.3d 366, 367 (11th Cir. 1997) (whether creditor held a security interest was pure question of law); Dowden v. Cross County Bank (In re Brittenum & Assoc., Inc.), 868 F.2d 272, 274 (8th Cir. 1989) (interpretation of bank accounts to determine whether lien rights existed was question of law); In re U.I.P. Engineered Prods. Corp., 43 B.R. 480, 482 (N.D. Ill. 1984) (whether title-retention clause created security interest was question of law for de novo review). See In re Baltic Assocs., L.P., 170 B.R. 568, 569 (E.D. Pa. 1994) (determining perfection was question of law).

3

**Discussion**

Unless collateral is in the possession of a secured party, for a security interest to attach and be enforceable, there must be a signed security agreement containing a description of the collateral, value must be given, and the debtor must have rights in the collateral. Minn. Stat. § 336.9-203(1)(a)(b) and (c) (Supp. 1999).[2] In this matter, the Trustee disputes only whether there is a signed security agreement that contains a description of the collateral. The Trustee urges that no such agreement exists because the loan agreement, although signed, does not contain a description of the collateral, and the funds advance voucher, although containing a description of the collateral, is unsigned. The Trustee asserts that strict construction of the statute requires the Debtor to sign the very document that contains a description of the collateral and relies on statements from the Eighth Circuit Court of Appeals in Shelton v. Erwin, 472 F.2d 1118, 1120 (8th Cir. 1973) for the principle that the requirements of the Uniform Commercial Code are unambiguous and should not be relaxed to accommodate even clear intentions of the parties. Id. The Credit Union, conversely, urges that its documents are integrated, with cross-references from one to another, and that under a composite document theory, all of the loan documents may be taken together to satisfy the requirements of Minn. Stat. § 336.9-203(1)(a).

First, this court finds that the general principle of Shelton is not dispositive because that case is entirely distinguishable from the present. In Shelton, the court was faced with a bill of sale and title application that clearly revealed an intent to create a security interest but contained no language whatsoever granting that interest. In this matter, the grant of a security interest is unequivocal. It is clearly stated in the loan agreement and echoed in the funds advance voucher. Here, the question is not whether there is a grant of a security

---

[2] Minn. Stat. § 336.9-203(1) states in relevant part,:
[A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:
    (a) the collateral is in the possession of the secured party pursuant to agreement, the collateral is investment property and the secured party has control pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral . . .
    (b) value has been given; and
    (c) the debtor has rights in the collateral.

4

interest, but whether the signed security agreement contains a description of the collateral which satisfies Minn. Stat. § 336.9-203(1)(a). To answer this question, we must first determine what documents comprise the security agreement.

Under Minnesota's adoption of the Uniform Commercial Code, "security agreement" is defined as "an agreement which creates or provides for security." Minn. Stat. § 336.9-105(l). An "agreement" is "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this chapter . . . ." Minn. Stat. § 336.1-201(3). In this case, both the language used by the parties and their course of conduct demonstrate that the funds advance voucher and the loan agreement together create the security agreement. The loan agreement grants the Credit Union a security interest in property and expressly states that such property will be described in a separate funds advance voucher. The funds advance voucher, when issued thereafter, contains a full description of the collateral and provides that its terms are made part of the loan agreement. By cross-reference, the description of the collateral in the funds advance voucher is made part and parcel of the loan agreement bearing the debtor's signature. Together, these documents constitute the security agreement and satisfy the signed-writing requirement of Minn. Stat. § 336.9-203(1)(a).

The course of conduct of the parties, and the purpose of the open-end loan program, also support the conclusion that the loan agreement and funds advance voucher are to be read together as comprising the security agreement. The loan program is designed to operate in such a way that an employee has to sign only one loan agreement, (which, in reality, serves as the credit application, loan agreement and Truth-in-Lending Disclosure Statement), and thereafter, the employee may request advances, whether as secured or unsecured Sub-accounts, in person or by telephone. Unless the documents are taken together, the open-end agreement cannot operate as intended. It is the purpose of the Uniform Commercial Code to promote and facilitate commercial transactions, "to simplify, clarify, and modernize the law governing commercial transactions, [and] to permit the continued expansion of commercial practices through custom, usage and agreement of the parties." Minn. Stat. § 336.1-102(2)(a)(b). To deny enforcement of the security interest in this case would elevate form over substance and negate the underlying principles of the code.

5

The Trustee suggests that unless the Debtor's signature appears on the very document that contains a description of the collateral, the Credit Union is able to unilaterally list property on the funds advance voucher and claim a security interest on property without the Debtor's knowledge. The procedures in this case, however, preclude such a result. As stated above, the Credit Union issued the loan proceeds check payable to the Debtor and to the automobile dealer from whom Debtor intended to purchase his vehicle. The Credit Union stamped an endorsement paragraph on the reverse side of the loan proceeds check which required specific acknowledgment of the lien granted and provided:

> *By endorsement of this check, it is agreed by the payees that: (1) this check shall only be used for the purchase by the first payee of 1993 GMC from second payee; (2) Said vehicle is free and clear of any liens, encumbrances or security interests; and (3) An application for a Certificate of Title for said vehicle shall immediately be filed naming the Hormel Employees Credit Union . . .as the first secured party.*

> _____
> *First Payee (Member-Borrower)*

> _____
> *Second Payee (Automobile Dealer)*

By virtue of this endorsement, no question can exist concerning the Debtor's full knowledge and consent to the grant of a security interest in the vehicle involved.

The drafters of the Uniform Commercial Code required a signed-writing describing the collateral pledged before a security interest could attach in order to address the very concerns raised by the Trustee. "A signed-writing prevents disputes over precisely which items of property are covered by a security interest." In re Numeric Corp., 485 F.2d 1328, 1331 (1st Cir. 1973) (citing Uniform Commercial Code § 9-203, Comment 3; J.K. Gill Co. v. Fireside Realty Inc., 262 Or. 486, 488, 499 P.2d 813, 814 (1972)). A signed-writing, thus serves as a statute of frauds to prevent enforcement of claims based on wholly oral representations. Id. See Minn. Stat. § 336.9-203, Comment 5. ("The formal requisite of a writing . . . is in the nature of a Statute of Frauds."). Minnesota courts have stated, "'[t]he principal function of a description of the collateral in a security agreement is to enable the

6

parties themselves . . . to identify it, particularly if the secured party has to repossess the collateral . . . .'" In re Immerfall, 216 B.R. 269, 273 (Bankr. D. Minn. 1998) (quoting James Talcott, Inc. v. Franklin Nat'l Bank, 194 N.W.2d 775, 782 (Minn. Ct. App. 1994)). See World Wide Tracers, Inc. v. Metro. Protections, Inc., 384 N.W.2d 442, 448 (Minn. 1986) (quoting James Talcott).

In light of these purposes, and the flexible definition of "security agreement" which includes documents that are incorporated into one another, or clarify one another, In re Nickerson & Nickerson, Inc., 452 F.2d 56, 57 (8th Cir. 1971) (deficient description of collateral in security agreement can be clarified by financing statement), where there is no question about the understanding of the parties, the court finds no reason to insist that the description of collateral must appear on the very same document which bears the debtor's signature. Provided "[a] writing or writings, regardless of label, . . . adequately describes the collateral, carries the signature of the debtor, and establishes that in fact a security interest was agreed upon . . . the formal requirements of [§ 9-203] and the policies behind it [are satisfied]." Numeric Corp., 485 F.2d at 1331.

In this case, there is no question that the parties demonstrated in writing their purpose to create a security interest in the specified vehicle. We therefore conclude that the bankruptcy court did not err in holding that this transaction satisfied the requirements of Minn. Stat. § 336.9-203(1). The Credit Union was properly entitled to summary judgment.

Accordingly, the order of the bankruptcy court is affirmed.

A true copy.

Attest:

CLERK, U.S. BANKRUPTCY APPELLATE PANEL,
EIGHTH CIRCUIT

7