**In re MID–ATLANTIC PIPING PRODUCTS OF CHARLOTTE, INC., Debtor.**

**Richard M. MITCHELL, Trustee, Plaintiff,**

**v.**

**ROCK HILL NATIONAL BANK, Defendant.**

Bankruptcy No. C–B–81–872.

Adv. No. 82–0296.

United States Bankruptcy Court, W.D. North Carolina, Charlotte Division.

Oct. 21, 1982.

Richard M. Mitchell, Charlotte, N.C., trustee.

Daniel G. Clodfelter and W. Benjamine Hawfield, Jr., of Moore & Van Allen, Charlotte, N.C., for Rock Hill Nat. Bank.

## MEMORANDUM OPINION AND ORDER

MARVIN R. WOOTEN, Bankruptcy Judge.

THIS MATTER came before the Court on August 30, 1982, for trial on the claims and counterclaims raised by the pleadings in an adversary proceeding filed by the Trustee on March 24, 1982. All parties were properly before the Court, and there is no issue concerning the Court's jurisdiction over the parties or the subject matter. The Court has considered the pleadings, the testimony and exhibits offered at trial, the briefs and arguments of the parties, and all other matters properly included in the record and now makes its findings of fact and conclusions of law in the following memorandum opinion and order.

In June, 1980, Fred Keeter, president of Mid-Atlantic Piping Products of Charlotte, Inc. (hereafter, "Debtor"), approached Robert Stephens of Rock Hill National Bank (hereafter, "Rock Hill") to seek a loan for the purpose of financing the Debtor's inventory. The Debtor was at that time in the business of wholesaling metal pipe of various types, a business which it continued until the filing of its Chapter 7 petition on September 28, 1981. Mr. Keeter was the sole shareholder in the Debtor in addition to being its president. (A second, minority shareholder was later admitted to the business.) Mr. Keeter negotiated a $100,000.00 loan from Rock Hill and signed on behalf of the Debtor a promissory note for this sum on June 23, 1980. The note carried an interest rate of 14 percent per annum and was to mature 180 days from the date of execution. Mr. Keeter and Mr. Stephens were the only people involved in any negotiations or discussions between the Debtor and Rock Hill concerning this loan then or at any later time.

The promissory note signed by Mr. Keeter was on a standard form denominated on its face "Consumer Loan Note." The note recited that its interpretation was to be governed by South Carolina law and more specifically by the terms of the South Carolina Consumer Credit Protection Code. Above Mr. Keeter's signature on the note appeared in handwriting a version of the Debtor's name—"Mid-Atlantic Piping Products, Inc." The address of the Debtor's place of business also appeared in handwriting on a line beside Mr. Keeter's signature. There is no dispute in this adversary proceeding that Mr. Keeter signed the promissory note on behalf of the Debtor or that the promissory note became a valid and binding obligation of the Debtor and not of Mr. Keeter personally.

At the time they negotiated the loan Mr. Keeter and Mr. Stephens also discussed what security the Debtor would give for the loan. The undisputed testimony from both men was that they intended that the Debtor would grant to Rock Hill a security interest in its inventory of pipe products. Accordingly, on June 23, 1980, Mr. Keeter also signed a document which was titled "Security Agreement." The terms of grant in this document recited:

I grant to Rock Hill National Bank a security interest in the following described property and its proceeds as collateral for repayment of your loan of $100,000.00 to Mid-Atlantic Piping Prod., Inc. dated June 23, 1980.

The collateral was described on the form simply as "UCC–1 on inventory." The security agreement provided that it was to be signed by all owners of the collateral, and a signature line was provided above which were printed the words "Signature(s) of Owner(s)." It is apparent from a consideration of other portions of the document, which need not be set out here, that the security agreement was a form designed for consumer transactions and intended as a companion form to the promissory note Mr. Keeter had signed. Unlike the signature on the promissory note, however, Mr. Keeter's signature on the security agreement was not accompanied by the Debtor's name or address or by any express reference to any official or representative capacity.

In addition to the promissory note and security agreement Mr. Keeter also executed two Uniform Commercial Code financing statements. One financing statement identified the debtor as "Mid-Atlantic Piping Products, Inc." and described the collateral as "all inventory in the possession of Mid-Atlantic Piping, Inc." The other financing statement identified the debtor as "Mid-Atlantic Piping Products" and described the collateral as "all inventory located at the above address." Although the names given for the Debtor differed on the two financing statements—from each other and from the correct form of the Debtor's name—both financing statements correctly gave the Debtor's business address. Each financing statement also showed above Mr. Keeter's signature the version of the Debtor's name used on that financing statement. The Trustee does not claim in this adversary proceeding that there is any issue concerning the proper signing of these financing statements, concerning the minor errors in stating the Debtor's name, or concerning the propriety of the place and time of filing of the financing statements.

During the negotiations for the $100,000 loan Mr. Keeter and Mr. Stephens discussed how the loan would be handled at maturity. They agreed that the Debtor's note could be renewed at maturity so long as accrued interest were paid and subject to any modifications in interest rate that might be agreed upon renewal. Mr. Stephens also requested that the loan principal be "taken out," or repaid, for at a period of at least thirty days during any calendar year.

The original note was in fact renewed on three occasions. New notes were executed by Mr. Keeter on December 22, 1980, on June 22, 1981, and lastly on September 21, 1981, seven days before the Debtor filed its Chapter 7 petition. On the occasion of each renewal the Debtor paid all interest then accrued and Mr. Keeter signed a new promissory note. In each case the parties used the same note form as for the original note, and Mr. Keeter signed each of these renewal notes as president of the Debtor with the Debtor's name and address appearing as on the original promissory note. No new

funds were advanced by Rock Hill pursuant to any of these renewals, and no part of the original $100,000 principal loaned by Rock Hill has ever been repaid. As with the original note, the Trustee concedes that these later notes were obligations of the Debtor and not personal obligations of Mr. Keeter.

Each time the promissory note was renewed Mr. Keeter also signed a security agreement in most material respects identical to the one he signed in connection with the first note. The security agreements were dated contemporaneously with the renewal notes, but, like the original security agreement, they were signed by Mr. Keeter without any express indication that he was signing in a representative or official capacity. The collateral was variously described in the subsequent security agreements as "inventory—UCC–1 on file" and finally in the last security agreement simply as "inventory."

The promissory notes, security agreements and financing statement thus described constitute the sole documentation of the loan from Rock Hill to the Debtor and of the security interest which is claimed by Rock Hill. Rock Hill has filed a proof of claim and has counterclaimed in this adversary proceeding seeking recovery of the $100,000.00 principal, accrued pre-petition interest, and such post-petition interest and attorneys' fees as may be allowable pursuant to 11 U.S.C. § 506(b). In this adversary proceeding the Trustee seeks to test the validity and determine the scope of Rock Hill's alleged security interest.

The Trustee presently holds approximately $70,000.00 as proceeds realized from the Debtor's inventory on hand on the petition date. He also holds an additional $24,000.00 which he has obtained in settlement of a preference claim against Process Valve Supply Company (hereafter, "Process Valve"), a company also owned by Mr. Keeter and engaged in a business similar to that formerly conducted by the Debtor. These latter funds represent the value of certain inventory of the Debtor that was

**318**

preferentially transferred by the Debtor to Process Valve in settlement of trade debts owed to Process Valve. The Trustee contends that there are defects in the documentation of Rock Hill's claimed security interest which entitle him to retain all these funds free of any lien claimed by Rock Hill. He further contends, as to the funds recovered by him from the preferential transferee, that even if Rock Hill has a valid security interest in the Debtor's inventory and its proceeds, the security interest does not extend to the funds recovered from any preferential transferee.

This second issue is of interest beyond the funds recovered from Process Valve, since the Trustee has identified three other prepetition transfers of inventory which he claims may have been preferential. If Rock Hill does hold a valid security interest in the proceeds of the Debtor's inventory, including any recovery of inventory or the value of inventory preferentially transferred by the Debtor, the exact value of Rock Hill's collateral cannot be determined until all preference litigation is settled or concluded. Thus, the parties have not presented to the Court at this time any issue concerning the extent to which Rock Hill may be secured or unsecured or the extent to which it may recover post-petition interest and attorneys' fees.

I. *Was There A Written Security Agreement Sufficient to Satisfy The Requirements of South Carolina Code § 36–9–203(1)?*

Among the conditions established by the Uniform Commercial Code for the enforceability of a security interest in personal property against a debtor and against third parties, including a bankruptcy trustee, is the requirement that there be a written security agreement "signed" by the debtor and containing a description of the collateral. S.C. Code § 36–9–203(1)(b). (The parties agree that the law of South Carolina governs in this case. Statutory citations are to the South Carolina codification of the Uniform Commercial Code.) It has been said that these requirements are principally in

the nature of a statute of frauds and should be interpreted accordingly. See Official Comment 5 and the South Carolina Reporter's Comments to § 36–9–203. The Trustee's position in this case is that there is no security agreement "signed" by the Debtor due to the failure of the security agreements to carry the Debtor's name on the signature line or to show that Mr. Keeter was signing in an official capacity as president of the Debtor. The Trustee further argues that this defect cannot be cured either by resort to evidence beyond the face of the security agreements or by consideration of documents other than the security agreements themselves.

Since the concept of "signing" is the heart of the dispute, a resort to S.C.Code § 36–1–201(39) is in order. That section explains that the term "signed" as it is used in the Code includes "any symbol executed or adopted by a party with present intention to authenticate a writing." According to the definition the key to whether or not a document has been "signed" by a party is the intention with which it was executed.

In several cases where the interpretation of a signature was at issue the courts have readily gone beyond the face of the documents in question to consider the circumstances surrounding their execution, especially where the signatures are susceptible to more than one interpretation. *E.g., In Re A & T Kwik-N-Handi Inc.,* 12 UCC Rep. 765 (B.C.M.D.Ga.1973); *In Re Excel Stores, Inc.,* 1 UCC Rep. 616 (D.Conn.1963), *rev'd on other grounds,* 341 F.2d 961 (2d Cir. 1965). In these two cases the courts considered oral testimony and other extrinsic circumstances to determine whether or not a signature which appeared on a security agreement was affixed with the intent to bind a particular party.

Such resort to extrinsic evidence is also permitted under South Carolina law. In *Lummus Cotton Gin Co. v. Cave,* 109 S.C. 213, 96 S.E. 94 (S.C.1918), the South Carolina Supreme Court considered a case in which the defendants had been sued on a promissory note which they had each signed individually and without any indication on

the face of the note that they were signing as agents for another party. The defendants contended, however, that they had signed the promissory note as the incorporators of a corporation which they intended to organize and that the promissory note was intended to be an obligation of that corporation. The promissory note evidenced a debt for the purchase price of certain machinery which was to be owned by and used in the business of the corporation. The Court held that the jury was entitled to consider evidence beyond the face of the note to determine the capacity in which the defendants had signed the note, and it sustained a verdict finding that the note was a binding obligation of the corporation, which had indeed been organized shortly after the note was signed, and not of the individual defendants.

■ There is ample reason in this case to inquire beyond the face of the security agreements to determine the capacity in which Mr. Keeter signed his name to the documents. Ambiguity arises from the fact that the security agreements each refer to the loan from Rock Hill to the Debtor as the obligation secured, and not to any personal obligation of Mr. Keeter. Further, the collateral covered by the agreements is inventory. Since the notion of individually owned inventory is not common except in cases of individual proprietorships, there is some reason to question the capacity in which Mr. Keeter signed. If Mr. Keeter had owned inventory as an individual proprietor, one would expect that the documents would have made some reference to the trade name under which he did business. An additional ambiguity arises from the fact that on the last two versions of the security agreement Mr. Keeter lists the address of the Debtor and not his own personal address when signing the agreements as "owner" of the collateral. There is, in short, ample warrant for resort to extrinsic evidence in order to consider the capacity in which Mr. Keeter signed the security agreements and the intent with which he affixed his signature.

■ The evidence before the Court is overwhelming that Mr. Keeter signed the security agreements with the intent to bind the corporate Debtor and grant a security interest in its inventory. This is the testimony of both Mr. Keeter and Mr. Stephens. It is also suggested by the fact that Mr. Keeter was expressly authorized by corporate resolution of the Debtor to "... give security for any liabilities of [the Debtor] to [Rock Hill] by pledge or assignment or a lien upon any real or personal property, tangible or intangible of [the Debtor]...." The testimony also confirmed that Mr. Keeter did not own any "personal inventory," making it virtually certain that he did not intend to sign in any individual capacity. There is no credible evidence that Mr. Keeter's signature on the security agreements was intended as anything other than a signature of the Debtor by its duly authorized officer, even though this was not made explicit by any reference to the Debtor's name on, above, under or near the signature line on the security agreement.

The facts compel the conclusion that there was a security agreement "signed" by the Debtor sufficient to comply with S.C. Code § 36–9–203(1)(b). However, the Court also finds support in a number of decisions by courts confronted with facts similar to, and in some cases less compelling than, those in this case. Although a complete recitation of their individual facts would be interesting, it is sufficient to note that in each of the following cases the "signature" issue was resolved in a manner identical to the ruling in this case and on facts which are substantially identical to those in the instant case. *In Re Reid Communications, Inc.,* 21 UCC Rep. 1436 (B.C. W.D.Va.1977) (considering the sufficiency of a signature on a security agreement which was signed by a vice president of a corporation without any indication of his official capacity); *In Re A & T Kwik-N-Handi, Inc., supra* (security agreement gave name of debtor without any indication that it was a corporation and agreement was signed by corporate officer without any statement of his official capacity); *In Re Bro Cliff, Inc.,* 8 UCC Rep. 1144 (B.C.W.D.

Mich.1971) (no reference in security agreement to corporate debtor's name or to official capacity of president of corporation who signed security agreement); *In Re Williams,* 16 UCC Rep. 240 (B.C.N.D.Ala. 1974) (considering the sufficiency of a signature on a financing statement where the name of the corporate secured party did not appear on the signature line and the only signature was that of an officer of the secured party without indication of her official title); *In Re Bengtson,* 3 UCC Rep. 283 (B.C.D.Conn.1965) (also involving a financing statement signature with facts similar to those in *Williams*); *Kramer v. Johnson,* 121 Ga.App. 848, 176 S.E.2d 108, 7 UCC Rep. 1335 (Ga.App.1970) (dealing with the sufficiency of signatures on a promissory note to bind a corporation where the corporation's name did not appear anywhere on the note and the official capacity of the officer signing the notes was not stated); and *Security Pacific National Bank v. Chess,* 58 Cal.App.3d 555, 129 Cal.Rptr. 852, 19 UCC Rep. 544 (Cal.App.1976) (involving endorsements on several checks, some of which were signed by the corporate payee's president without any reference to his official capacity or to the corporation itself).

Although there is ample evidence that the documents denominated "security agreements" are sufficient considered by themselves, there is an independent basis upon which the Court's ruling can rest. Courts in a number of jurisdictions have concluded that an issue concerning compliance with the requirements of Uniform Commercial Code § 9–203(1)(b) is often a matter which requires consideration of a group of documents taken together. *E.g., In Re EJM, Inc.,* 1 B.R. 119, 21 C.B.C. 609, 28 UCC Rep. 192 (Bkrtcy.N.D.Ga.1979); *In Re Modern Engineering & Tool Co., Inc.,* 25 UCC Rep. 580 (B.C.D.Conn.1978); *In Re Truckers International, Inc.,* 4 B.C.D. 713, 17 C.B.C. 642, 17 UCC Rep. 1337 (W.D. Wash.1975).

Although the South Carolina courts have not ruled on this precise point, courts in North Carolina have done so. Since the Debtor case was a North Carolina corporation and conducted its business in North Carolina, such authority is highly persuasive. In *Evans v. Everett,* 279 N.C. 352, 183 S.E.2d 109, 9 UCC Rep. 769 (1971), the North Carolina Supreme Court considered whether a financing statement could serve as a written security agreement to satisfy N.C.G.S. § 25–9–203(1)(b). In *Evans,* unlike in this case, there was no separate document called a security agreement, but the Court found that the language of a promissory note considered together with the terms and language of a financing statement were sufficient to create a security interest in collateral owned by the debtor on the note. The signatures on the note and financing statement were sufficient to comply with § 25–9–203(1)(b) and § 25–1–201(39). *Accord, Little v. County of Orange,* 31 N.C.App. 495, 229 S.E.2d 823, 20 UCC Rep. 1045 (1976).

The promissory note and the financing statement in *Evans* referred to each other. The promissory notes and financing statements in this case do not contain any express cross references, but other internal references and similarities in the promissory notes, the security agreements and the financing statements are still sufficient to link the documents in a way which gives assurance that a security interest was intended and was granted in the inventory of the Debtor. The Trustee does not contest that the promissory notes and the financing statements were properly "signed" by the corporate Debtor. Each note and companion security agreement were executed contemporaneously. Two of the promissory notes (the first and second renewals, although not the original note and the last renewal) showed a check mark in a box on the form which stated:

This loan is secured by a Security Agreement or Mortgage dated [here showing the dates of execution of the security agreements], which you have signed, giving us a security interest in the collateral described in that agreement.

The original promissory note and the security agreement executed at the time of the first renewal of the note both refer to the financing statements which were executed

by the Debtor. (None of the other documents, however, made any specific reference to the financing statements.) The documentation is erratic, but considering the promissory notes and the financing statements together with the security agreements, it is plain that the security interest granted to Rock Hill was a security interest in the inventory of the corporate Debtor, and the Court so holds.

II. *Has the Collateral Been Adequately Described as Required by South Carolina Code § 36–9–203(1)(b)?*

■ The Trustee also contends that the description of the collateral in the security agreements is not sufficient to comply with the requirements of § 36–9–203(1)(b). The sufficiency of a description of collateral is a matter governed by S.C.Code § 36–9–110. That section provides that a description of property is sufficient "... whether or not it is specific if it reasonably identifies what is described." Detail, in other words, is not required for its own sake.

The original security agreement in this case described the collateral as "UCC–1 on inventory," referring to the financing statements executed by the Debtor and filed as set out above. The financing statements, in turn, described the collateral in one instance as "all inventory in the possession of Mid-Atlantic Piping, Inc." and in the other case as "all inventory located at the above address," referring to the address of the Debtor. (It is conceded that the Debtor had only one business address.) The security agreement executed at the time of the first note renewal described the collateral as "inventory—UCC–1 on file," and the security agreements executed at the time of the second and third note renewals both referred laconically to "inventory." Each of these descriptions is sufficient reasonably to identify the collateral. The Fourth Circuit Court of Appeals has held that a description of collateral merely as "accounts receivable" was sufficient in *In Re Varney Wood Products Inc.,* 458 F.2d 435, 10 UCC Rep. 513 (4th Cir.1972), and a description of collateral as "all inventory financed by these transactions" was held sufficient to secure a

floor plan lending arrangement in *Coseo v. Alpena Savings Bank,* 612 F.2d 276, 28 UCC Rep. 816 (6th Cir.1980). *Accord, In Re Plaza Home Center, Inc.,* 31 UCC Rep. 1485 (B.C.M.D.Pa.1980) ("inventory for sale" held to be sufficient); *Borg-Warner Acceptance Corporation v. Wolfe City National Bank,* 544 S.W.2d 947, 21 UCC Rep. 631 (Tex.Civ. App.1976) ("all inventory" held to be sufficient).

There is no reasonable likelihood that a third party could have been misled by the descriptions contained in the documents. Any third party making inquiry would have come upon the financing statements, both of which plainly refer to the inventory of the Debtor located at its place of business. Although the security agreements themselves are more sparse, they are nonetheless sufficient in ordinary commercial understanding to tell a third party that the collateral being claimed was all the goods held by the Debtor for sale or lease to others.

The Trustee's argument concerning the description of the collateral is actually only a variation of his argument concerning the sufficiency of the signatures: he urges that the security agreements don't make clear *whose* inventory is being given as collateral and that therefore the description of the collateral is not sufficient. Since there is no reasonable construction of the documents other than that Mr. Keeter signed the security agreements on behalf of the Debtor, the Court is of the opinion that this issue must also be resolved in favor of Rock Hill.

III. *Does Rock Hill's Security Interest Reach the Proceeds of Inventory Preferentially Transferred by the Debtor Prior to September 21, 1981, and Subsequently Recovered by the Trustee?*

On Schedule G attached to its petition and statement of affairs the Debtor showed four transfers of inventory to trade creditors which occurred within 90 days prior to the petition date. In each case the Debtor, in order to satisfy money debts owed to its suppliers, transferred a portion of its inven-

tory to those suppliers in exchange for a cancellation of the indebtedness. One such transfer (to Process Valve, Mr. Keeter's other business) has already been avoided by the Trustee, and the Trustee has recovered from Process Valve the value of the inventory it received. Rock Hill contends that any such recoveries are also subject to its security interest, and the Trustee disputes this contention. For purposes of this issue, of course, it is taken that the previous two questions have been resolved favorably to Rock Hill.

Before considering the Trustee's main argument there is a preliminary question to be addressed. All but one of the four allegedly preferential transfers occurred between the time the second renewal note was signed on June 21, 1981, and the time the last note was signed on September 21, 1981. The remaining transfer took place at a time when the parties were operating under the note and security agreement executed on December 22, 1980. At the time of each of the transfers, then, Rock Hill held a security interest in the inventory transferred, based on the documentation then in effect. Furthermore, the transfers themselves did not extinguish Rock Hill's security interest, as the following discussion demonstrates.

Under S.C.Code § 36–9–306(2) a security interest in collateral continues in that collateral:

> ... notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

In other words, inventory of the Debtor in which Rock Hill held a valid security interest would still have been subject to the security interest after its transfer to trade creditors *unless* the transfers were authorized. Unless the transfers were authorized, the Trustee's recovery of the transferred inventory or its value pursuant to his powers under 11 U.S.C. § 547 and 11 U.S.C. § 550 would also be subject to Rock Hill's security interest.

There is no evidence to suggest that the four transfers of inventory were authorized in the security agreements themselves or in any of the other documentation evidencing the relationship between Rock Hill and the Debtor. Instead, probably because the security agreements used by the parties were primarily consumer forms, the documents expressly provide that the collateral will not be sold by the Debtor at all.

■ Authorization for a transfer or other disposition of collateral may be implied from the parties' conduct or from their course of dealing or from applicable usages of trade and need not be expressly granted in the security agreement. The Trustee presented no evidence as to any usage of trade authorizing the transfers in question, and from the evidence that was presented concerning the dealings between the parties the Court could not conclude that the four transfers in question were impliedly authorized by Rock Hill unless they could qualify as ordinary course transfers of the Debtor's inventory. The parties obviously did not intend a flat prohibition of all sales of the Debtor's inventory. The nature of the collateral itself and the parties' understanding of the Debtor's business and the purpose of the loan at the time they entered into their relationship make clear that sales of inventory in the ordinary course of the Debtor's business were necessarily contemplated by both parties. On the other hand, if the transfers in question were outside the ordinary course of the Debtor's business, the Court would be reluctant to conclude that there was any implied authorization of the transfers without at least some showing that Rock Hill was informed of the transfers or had facts sufficient to put it on notice of the transfers. There is, however, no evidence to suggest that Rock Hill was aware of or had any notice of the transfers in question at any time before the Debtor filed its petition. Indeed, all the testimony was to the contrary. In sum, then, unless these transfers were of a type which might occur in the ordinary course of the Debtor's business, so as to come within the scope of

an implied understanding at the time of the original loan in June, 1980, there would be no ground for finding them to be authorized in any of the senses embodied in § 36–9–306(2).

■ Were the transfers made in the ordinary course of the Debtor's business? The concept of "ordinary course of business" is a familiar one in the Uniform Commercial Code, and for guidance in determining the scope of the concept the Court can turn to the definition of "buyer in the ordinary course of business" found in § 36–1–201(9). The Code defines the term "buying" for purposes of this concept as follows:

Buying may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a preexisting contract for sale *but does not include a transfer* in bulk or as security for or *in total or partial satisfaction of a money debt.*

(Emphasis added). The definition of buying in the ordinary course thus expressly excludes a situation where a party receives goods in satisfaction of an antecedent money debt owed to that party. *Ex hypothesi,* however, each of the transferees involved in this case took inventory from the Debtor in satisfaction of antecedent trade debts owed them. This is so because it is assumed by the Trustee that the transfers are or may be found to be preferential, and a preferential transfer is, by definition, a transfer for or on account of an antecedent debt. See 11 U.S.C. § 547(b)(2). It is plain as a matter of law, then, that the transferees could not have qualified as "buyers in the ordinary course of business."

This conclusion has also been reached by a number of other courts which have considered whether a buyer who takes goods in satisfaction of an antecedent debt could qualify for "buyer in the ordinary course of business" status. *E.g., Ray v. City Bank & Trust Co.,* 358 F.Supp. 630, 31 UCC Rep. 355 (D.Ohio 1973); *Evans Products Co. v. Jorgensen,* 245 Or. 362, 421 P.2d 978, 3 UCC Rep. 1099 (1966); *Chrysler Credit Corp. v. Malone,* 502 S.W.2d 910, 13 UCC Rep. 964

(Tex.Civ.App.1973); *Stephenson Finance Co. v. Bruce,* 254 S.C. 249, 174 S.E.2d 750 (1970). For this reason, it also follows that the transferees did not take free of Rock Hill's security interest as "buyers in the ordinary course of business" entitled to the priority granted in § 36–9–307(1).

Perhaps, though, the alleged preferential transferees were not "buyers" of the Debtor's inventory in any sense, whether in or out of the ordinary course of the Debtor's business. The Court is of the opinion that the transferees were "buyers" of the Debtor's inventory for the following reason. According to § 36–2–103(1)(a) a "buyer" is a person who buys or contracts to buy goods. Buying necessarily involves a "sale," and § 36–2–106(1) defines a "sale" as a passing of title from the seller to the buyer for a price. Since under § 36–2–304(1) a "price" may be payable in goods as well as in money, and since under that same section a party who transfers goods in payment of a "price" is a seller of those goods, it follows that the party who receives goods in payment of a price owed him for the sale of certain other goods is a "buyer" of the goods he receives in payment. *E.g., Calloway v. Manion,* 572 F.2d 1033, 1036, 23 UCC Rep. 1143 (5th Cir.1978); *Gross v. Vogel,* 81 App.Div.2d 576, 437 N.Y.S.2d 431, 31 UCC Rep. 244 (1981); *Gunderland v. Marine Supply, Inc. v. Bray,* 570 S.W.2d 542, 25 UCC Rep. 57 (Tex.Civ.App.1978).

Even if the transferees were to be characterized in some other fashion, the Court is of the opinion that this would still not avail the Trustee. For even if the preferential transferees were not "buyers," the Trustee would still be obligated to prove that the transfers of inventory in satisfaction of trade debts were sufficiently regular and ongoing so that even without Rock Hill's express knowledge they could be considered to be part of the Debtor's ordinary course of business and thus impliedly authorized by Rock Hill. There has been no proof on this point.

Because the transfers in question were not made to buyers in the ordinary course of business and because there was no other

express or implied authorization of the transfers by Rock Hill, it follows under § 36–9–306(2) that Rock Hill's security interest would survive the transfers and continue in the property as it was returned to the Trustee. If this were all of the Trustee's argument, the issue would now be settled. However, the heart of the Trustee's argument is that even if Rock Hill's security interest survived the transfers at the time they were made, the security interest was subsequently lost when the parties executed a new promissory note and security agreement on September 21, 1981. The Trustee contends, in other words, that upon the execution of each promissory note and security agreement after the first, all rights and obligations which either party had under the superseded documents were extinguished and the parties agreed thereafter to the substitution of new rights and obligations under the new documents. If the Trustee's position is valid, then it is correct to say that although Rock Hill's security interest in inventory which was preferentially transferred survived the transfers themselves, it was nonetheless extinguished when the parties re-executed new documents after the transfers had occurred. (As an aside, it may be noted that had Rock Hill and the Debtor not executed new documents on September 21, 1981, this issue would not arise.)

Generally, the mere execution of a renewal note does not discharge the original debt but operates only as an extension of the same debt, unless the parties by agreement express a contrary intention. *Mid-Eastern Electronics, Inc. v. First National Bank of Southern Maryland*, 455 F.2d 141 (4th Cir.1970); *Sullivan v. Sullivan Mfg. Co.*, 20 S.C. 79 (1883); *National Bank of Chester v. Gunhouse & Co.*, 17 S.C. 489 (1882); *Cable v. Hardin Oil Co.*, 10 N.C.App. 569, 179 S.E.2d 829, *cert. denied* 278 N.C. 521, 180 S.E.2d 863 (1971); *State Bank of Young America v. Vidmar Iron Works, Inc.*, 292 N.W.2d 244, 28 UCC Rep. 1133 (Minn. 1980); 10 *C.J.S.* Bills and Notes § 279. In consequence of this well-established rule, the burden of proving that the parties to a renewal or re-execution of a promissory note intended to extinguish the prior debt and to establish a novation rests on the party asserting the novation. *Superior Automobile Insurance Company v. Maners*, 261 S.C. 257, 199 S.E.2d 719 (1973); *Sullivan v. Sullivan Mfg. Co., supra; In Re Cantrill Construction Company*, 418 F.2d 705, 6 UCC Rep. 1217 (6th Cir.1969), *cert. denied* 397 U.S. 990, 90 S.Ct. 1124, 25 L.Ed.2d 398.

The testimony in this case was that at the time of the original loan in June, 1980, the parties discussed how the loan would be handled on maturity. It was their understanding and intention that the loan would be "rolled over" with interest only being paid by the Debtor and a new maturity date being established. It was also contemplated that the interest rate on the loan might be readjusted at subsequent renewals. From the beginning, then, the parties contemplated that renewals would occur, and indeed at the subsequent maturity dates on the original note and each renewal the parties in fact re-executed a new promissory note identical in its terms to the previous one except for the maturity date and the interest rate. There were no new funds advanced nor was there any other modification of the terms of the promissory note or loan. This is strong evidence that the parties understood there to be a single indebtedness and not a series of separate and successive debts.

It is also significant that at the time of each note renewal the existing note was not marked "paid" but instead was marked "paid by renewal" and returned to the Debtor, this difference indicating that something other than extinguishment of the original obligation was intended. The testimony from Mr. Stephens was that he requested that the Debtor "take out" Rock Hill for at least thirty days out of each year, meaning that for at least one month of every year there would be no principal outstanding. This is further evidence that the parties meant there to be a difference between a mere renewal of the obligation and a payment or extinguishment of the obligation evidenced by the notes.

Strictly speaking, it would not have been necessary for the parties to have executed new security agreements at the time of the renewal notes, since the security agreement originally signed on June 23, 1980, would have been sufficient to cover such renewal notes even though it did not contain any express provision relating to such renewals. See *Barrington v. Skinner,* 117 N.C. 48, 23 S.E. 90 (1895) (security for promissory notes was not released when renewal notes were executed and old notes were marked "surrendered for renewal note"); *In Re Cantrill Construction Co., supra; Community Bank v. Meister Bros., Inc.,* 12 Ill.App.3d 1004, 299 N.E.2d 589, 13 UCC Rep. 371 (1973); and generally see 10 *C.J.S.* Bills and Notes § 281 ("The extention of time for payment or taking of a renewal note does not release security pledged for the payment of the original debt.") The Trustee, however, points to the fact that new security agreements *were* signed each time the notes were renewed to support his claim that the parties did understand that they were cancelling and extinguishing one note and security interest and evidencing a new obligation and a new security interest. The Court is not persuaded that the signing of new security documents sufficiently evidences a novation of the obligation and creation of a new security interest. It would be incongruous to insist that the parties intended to extinguish one security interest and create a new one although they did *not* intend a novation with respect to the underlying obligation evidenced by the promissory notes. As noted above, it seems plain that they did not intend a novation with respect to the loan itself. It would be more proper, then, to speak of the re-documentation of an existing and continuing security interest rather than the extinguishment of one security interest and the substitution of a new one.

The position advanced by the Trustee would be contrary to the most commercially reasonable interpretation of the parties' conduct. If the Trustee were correct, then the re-documentation of the security interest at various points would have meant that Rock Hill would have released all its then-existing collateral. Rock Hill would have foregone all proceeds from inventory sold by the Debtor prior to the date of the re-documentation and started anew with a security interest only in such inventory as was on hand at the time the new security agreement was signed. Although this *might* have been intended, the Trustee has presented no evidence to show that this should be considered typical commercial behavior or that the parties specifically meant such a result.

On all the available evidence the Court finds that the re-documentation of the loan and the security interest through the execution of new promissory notes and security agreements were not intended by either of the parties to constitute novations but were instead tied to the extension of the loan maturity date which was foreseen as a possibility at the time of the original advance of funds to the Debtor. For this reason, the Court holds that Rock Hill's security interest extends to the proceeds of any recovery by the Trustee of inventory which may have been preferentially transferred by the Debtor at any time while Rock Hill held a valid security interest in such inventory.

IV. *Does the Interest Rate Carried on Rock Hill's Loan Exceed the Maximum Allowed by Law?*

A final issue raised by the Trustee arises again out of the parties' use of what were apparently standard consumer loan documents. The Trustee contends that the rate of interest carried by each of the promissory notes after the original note exceeded the 18 percent maximum established by the South Carolina Consumer Credit Protection Act in § 37–3–201. The first renewal note signed on December 22, 1980, carried an interest rate of 20.5 percent; the second and third renewal notes signed on June 22 and September 21, 1981, respectively, both carried rates of 20 percent. The penalty provided in the South Carolina Consumer Credit Protection Code for charging an interest rate in excess of the permitted maximum is that the lender forego collection of and refund upon demand any interest paid in excess of the permitted maximum.

Although it is clear that the loan involved in this case would not be considered a "consumer loan" under the definitions contained in the South Carolina Consumer Credit Protection Code, the Trustee relies on language in each of the promissory notes which states:

Unless I am using the money you loan me to buy land which is mortgaged to you, this loan and any agreements made in connection with it shall be governed by the terms of the South Carolina Consumer Credit Protection Code regardless of my use of the loan proceeds.

The force of this clause comes from S.C. Code § 37–3–601, which provides in substance that the parties to a loan which would not otherwise be treated as a consumer loan may expressly agree in writing that it shall be considered subject to the Consumer Credit Protection Code, in which case the loan shall for all purposes under that Code be considered as if it were a "consumer loan."

On this issue the Court agrees with the Trustee. Accordingly, the Trustee will be entitled to set off against Rock Hill's claim the amount of all interest actually paid by the Debtor in excess of 18 percent per annum. To the extent it may later be found that Rock Hill is entitled to collect post-petition interest on its loan, such interest shall be also limited to 18 percent per annum.

In accord with the foregoing memorandum opinion it is therefore ORDERED, ADJUDGED, AND DECREED that

(1) Rock Hill National Bank's claim against the Debtor is allowed in the principal amount of $100,000.00;

(2) The claim of Rock Hill National Bank shall be treated as a secured claim to the extent of (a) any inventory of the Debtor now in the hands of the Trustee and acquired by the Debtor prior to the filing of its Chapter 7 petition, (b) any proceeds from such inventory acquired by the Trustee upon sale or other disposition after the filing of the Chapter 7 petition, and (c) any inventory or the proceeds of any inventory recovered by the Trustee from any one or more of the alleged preferential transferees

shown on Schedule G attached to the Debtor's statement of affairs.

(3) The Trustee shall be entitled to set off against Rock Hill's claim the amount of any interest actually paid by the Debtor to Rock Hill in excess of 18 percent per annum and Rock Hill shall be limited to post-petition interest, if any is allowable, at a rate of 18 percent per annum.

(4) Rock Hill National Bank's claim for post-petition interest and for attorneys' fees as provided in the note and security agreement evidencing its claim are allowed to the extent permitted by 11 U.S.C. § 506(b), with the actual amounts allowable to be determined by further order of the Court.

(5) Each party shall bear its own costs.